**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JERALD FRIEDMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>AARP, INC.; AARP SERVICES, INC; AARP INSURANCE PLAN; UNITEDHEALTH GROUP, INC.; UNITEDHEALTH CARE INSURANCE COMPANY,<br><br>*Defendants-Appellees*. | No. 14-56765<br><br>D.C. No. 2:14-cv-00034-DDP-PLA<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted October 19, 2016
Pasadena, California

Filed May 3, 2017

Before: Richard C. Tallman, Barrington D. Parker, Jr.[*]
and Morgan Christen, Circuit Judges.

Opinion by Judge Parker

---

[*] Senior United States Circuit Judge for the U.S. Court of Appeals for the Second Circuit, sitting by designation.

## SUMMARY[**]

### California Insurance Law

The panel reversed the district court's Fed. R. Civ. P. 12(b)(6) dismissal of a complaint brought by a plaintiff Medicare beneficiary who purchased private supplemental health insurance through a group Medigap policy, alleging that AARP Insurance Plan transacted insurance without a license in violation of the California Insurance Code.

California's Unfair Competition Law ("UCL") broadly prohibits "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

The panel held that plaintiff stated a plausible claim at the motion to dismiss stage that AARP "solicits" insurance without a license, and, as a consequence, committed an "unlawful" act in violation of the UCL.

The panel also held that plaintiff adequately alleged that defendants violated the "fraudulent" and "unfair" prongs of the UCL. The panel concluded that plaintiff plausibly alleged that members of the public were likely to be deceived where AARP allegedly misleadingly told its members that their payment only covered AARP's expenses and the premium for

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

UnitedHealth's Medigap coverage, but in reality, the payments included an imbedded commission which was not an expense payment.

The panel remanded for further proceedings.

**COUNSEL**

Andrew S. Love (argued) and Susan K. Alexander, Robbins Geller Rudman & Dowd LLP, San Francisco, California; Kevin K. Green, Frank J. Janecek, Jr., and Christopher Collins, Robbins Geller Rudman & Dowd LLP, San Diego, California; Stuart A. Davidson, Mark J. Dearman, and Christopher C. Martins, Robbins Geller Rudman & Dowd LLP, Boca Raton, Florida; Sean K. Collins, Boston, Massachusetts; Michael F. Ghozland, Ghozland Law Firm, Los Angeles, California; for Plaintiff-Appellant.

Brian D. Boyle (argued) and Meaghan VerGow, O'Melveny & Myers LLP, Washington, D.C.; Christopher B. Craig, Los Angeles, California; for Defendants-Appellees UnitedHealth Group, Inc. and United HealthCare Insurance Company.

Douglas E. Winter, Bryan Cave LLP, Washington, D.C.; Jeffrey S. Russell and Darci F. Madden, Bryan Cave LLP, St. Louis, Missouri; for Defendants-Appellees AARP, Inc., AARP Services, Inc., and AARP Insurance Plan.

## OPINION

PARKER, Circuit Judge:

Plaintiff Jerald Friedman, a Medicare beneficiary, purchased private supplemental health insurance through a group Medigap policy held by Defendant AARP Insurance Plan ("AARP"), and underwritten and sold by Defendant UnitedHealth Care Insurance Company ("UnitedHealth"). Medigap policies offer supplemental private health insurance to cover costs not covered by Medicare. Friedman filed this putative class action alleging, in essence, that AARP, through its arrangement with Medigap, transacts insurance without a license in violation of the California Insurance Code. Friedman sought relief pursuant to California's Unfair Competition Law and the common law. The district court granted Defendants' motion under Rule 12(b)(6) and dismissed the complaint with prejudice. We reverse.

## I

AARP, a not-for-profit corporation formerly known as the American Association of Retired Persons, is a dominant figure in the market for Medigap health insurance. *See Vencor Inc. v. Nat'l States Ins. Co.*, 303 F.3d 1024, 1026 (9th Cir. 2002) (describing Medigap health insurance).[1] Approximately one-third of all Medigap policyholders nationwide are enrolled in AARP's program, more than three times AARP's closest competitor. AARP does not itself provide insurance coverage, nor is it licensed to do so. Rather, it is the group policyholder for Medigap coverage

---

[1] The facts recounted in this section derive principally from the complaint and its attachment.

underwritten and sold by UnitedHealth, the country's largest health insurer. In 2011, Friedman purchased UnitedHealth Medigap coverage through AARP's group policy.

AARP and UnitedHealth's Medigap arrangement is governed by a 1997 joint venture agreement (the "AARP-United Agreement" or the "Agreement"). The Agreement requires that individuals wishing to purchase Medigap coverage from UnitedHealth do so through AARP's group policy. The Agreement also requires that AARP administer key aspects of the program, which involves two principal tasks.

First, AARP solicits its members' enrollment in the Medigap program. An agreement between AARP and its subsidiary trust, Defendant AARP Insurance Plan (the "AARP Trust") contractually obligates AARP to "solicit member participation in the [Medigap] Plan by direct mail and otherwise." ER 299.[2] AARP discharges this duty through television commercials, its website, and other forms of advertisements. For example, a website owned by Defendant AARP Services, Inc., a for-profit, wholly-owned subsidiary of AARP, explained why AARP members should "get an AARP Medicare Supplement Plan." ER 276. It emphasized that: (i) AARP Medicare Supplement Plans are the "only Medicare Supplement plans endorsed by AARP"; (ii) the plans are "[i]nsured by UnitedHealthcare Insurance Company, the insurer serving the most Medicare supplement enrollees nation wide"; and (iii) there is a "94% Customer Satisfaction Rate of those surveyed." ER 276. Many of the marketing materials owned and controlled by AARP state in

---

[2] References to "ER" are to the Excerpts of Record filed with this appeal.

bold font: "**This is a solicitation of insurance**."  *See*, *e.g.*, ER 270, 272, 276, 278.

Second, AARP collects insurance premiums from members through the AARP Trust and remits the appropriate payment to UnitedHealth.  The AARP-United Agreement also allows AARP to invest the collected payments prior to remittance to UnitedHealth.  Significantly, AARP deducts and retains 4.95% of each dollar paid by UnitedHealth Medigap enrollees prior to remitting the premiums to UnitedHealth.  Whether this deduction was plausibly alleged to be an insurance commission is a key issue on this appeal.

The initial version of the AARP-United Agreement referred to this retained amount as an "allowance."  ER 99.  However, following settlement of a dispute with the Internal Revenue Service, AARP and UnitedHealth amended their agreement to provide that the "allowance" would be referred to as a "royalty."  Compl. ¶ 46, ER 20.  Defendants assert that the 4.95% retention is a permissible royalty payment made by UnitedHealth in exchange for its use of AARP's intellectual property (*i.e.*, its logo) in connection with the Medigap program.   The complaint, however, characterizes this arrangement quite differently:

> [I]n exchange for AARP's administering of the insurance program and the marketing, soliciting, and selling or renewing AARP Medigap policies on behalf of UnitedHealth, as well as its collecting and remitting insurance premiums on behalf of UnitedHealth, AARP earns a 4.95% commission, disguised as a "royalty," on each policy sold or renewed.

Compl. ¶ 51, ER 22. In short, Friedman alleges that the 4.95% retained by AARP is a commission on the sale of insurance that is charged over and above the actual monthly premium that UnitedHealth charges for Medigap coverage which AARP is not entitled to collect because it is not licensed to transact insurance in California. *See* Cal. Ins. Code § 1631 (providing that persons subject to the California Insurance Code "shall not solicit, negotiate, or effect contracts of insurance" without a license).

Friedman is not the first to question AARP's retention of its fee pursuant to the AARP-United Agreement. At some point, according to allegations in the complaint, regulators began to question AARP's tax-exempt status in light of the substantial income AARP was earning through this arrangement. In 2011, the House Committee on Ways and Means reviewed the circumstances surrounding AARP's retention of the 4.95% fee. Although Defendants argue here that this fee is taken out of the insureds' premium payments, Br. of Appellee 7, 32, AARP's CEO testified to the Committee that the "royalties have nothing to do with the premiums of beneficiaries," and that "[n]one of the money is taken out of any of the premiums," Compl. ¶ 63, ER 28–29 (internal quotation marks omitted). Friedman alleges that AARP has concealed the fact that the 4.95% supposed "royalty" was an insurance commission collected in addition to the actual premium charged by UnitedHealth, and was an amount he otherwise would not have paid.

Friedman filed a putative class action alleging violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210; money had and received; and conversion. The gravamen of his complaint is that by soliciting insurance and accepting an insurance commission,

AARP unlawfully transacts insurance without a license in violation of the California Insurance Code. This conduct, according to Friedman, constitutes an unfair business practice under California law that has caused harm to him and the purported class.

Defendants moved to dismiss pursuant to Rule 12(b)(6). The district court granted the motion and dismissed the complaint with prejudice. The court concluded that "Plaintiff has not plausibly alleged that AARP acted improperly as an 'unlicensed insurance agent' who was paid a 'commission' for the 'sale' of insurance." ER 5–6. Rather, it concluded that AARP's actions "are entirely consistent with [a] permissible arrangement." ER 6. The court rejected Friedman's allegation that the 4.95% fee was an improper commission, concluding that the "payment, labeled a 'royalty' by the agreements between AARP and UnitedHealth, is not a 'commission' under the facts alleged." ER 8. The court also rejected Friedman's allegation that AARP "solicited" insurance, reasoning that none of the marketing materials identified by Plaintiff "permits an individual to purchase insurance coverage or submit an application for insurance." ER 6. This appeal followed.

## II

"We review a district court's ruling on a motion to dismiss de novo." *Fed. Trade Comm'n v. AT&T Mobility LLC*, 835 F.3d 993, 997 (9th Cir. 2016). To survive dismissal, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Our review is confined to the complaint's "face" because, "[a]s a general rule, we may not consider any material beyond the pleadings in ruling

on a Rule 12(b)(6) motion." *United States v. Corinthian Colls.*, 655 F.3d 984, 998 (9th Cir. 2011) (internal quotation marks omitted). However, "[c]ertain written instruments attached to pleadings may be considered part of the pleading," and "[e]ven if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). A court must accept "all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009) (internal quotation marks omitted). Finally, "[a]s a federal court sitting in diversity, we must apply the substantive law of California, as interpreted by the California Supreme Court." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1103 (9th Cir. 2013) (internal quotation marks omitted).

## III

Friedman's principal contention is that AARP's Medigap arrangement violates California's Unfair Competition Law ("UCL"). *See* Cal. Bus. & Prof. Code §§ 17200–17210. The UCL broadly prohibits "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Because the statute is written in the disjunctive, it is violated if a defendant violates any of the unlawful, unfair or fraudulent prongs. *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). The California Supreme Court has emphasized that the "UCL's 'scope is broad,' and its coverage is 'sweeping.'" *People ex rel. Harris v. Pac Anchor Transp., Inc.*, 329 P.3d 180, 188

(Cal. 2014) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 560 (Cal.1999)).

## A

With respect to the unlawful prong of section 17200, it is clear that "[v]irtually any state, federal, or local law can serve as the predicate." *See People ex rel. Lockyer v. Fremont Life Ins. Co.*, 128 Cal. Rptr. 2d 463, 469 (Ct. App. 2002) (internal quotation marks omitted).  Friedman's allegations focus primarily on purported violations by AARP of the California Insurance Code, a UCL predicate, *see Stevens v. Superior Court*, 89 Cal. Rptr. 2d 370, 379 (Ct. App. 1999).  Friedman relies most specifically on section 1631, which states that:

> Unless exempt by the provisions of this article, a person shall not solicit, negotiate, or effect contracts of insurance, or act in any of the capacities defined in Article 1 (commencing with Section 1621) unless the person holds a valid license from the commissioner authorizing the person to act in that capacity.

Cal. Ins Code. § 1631.  Section 1622, referenced in section 1631, defines a "life licensee" as "a person authorized to act on behalf of a life insurer or a disability insurer to transact" insurance.  Cal. Ins Code. § 1622.  Further, section 1633 provides that "[a]ny person who transacts insurance without a valid license so to act is guilty of a misdemeanor."  Cal. Ins Code. § 1633; *see also Stevens*, 89 Cal. Rptr. 2d at 377 n.9 ("[T]ransacting insurance without a license [is not] a 'mere technical violation' as defendants contend; it is unlawful.

(§ 1633.)").**[3]**  The Insurance Code defines the term "transact" to include "solicitation," "negotiations preliminary to execution," "execution of a contract of insurance," or "transaction of matters subsequent to execution of the contract and arising out of it."  Cal. Ins. Code § 35.

Friedman alleges—and Defendants do not dispute—that AARP is not licensed in California to "solicit, negotiate, or effect contracts of insurance," nor is it licensed to "transact" insurance.  At issue therefore is whether Friedman has adequately pled that AARP has engaged in any of those listed activities.**[4]**  We conclude that he has.  In short, Friedman has adequately pled that AARP both "transacts" and "solicits" insurance without a license in violation of the California Insurance Code.

First, the complaint alleges that AARP "transacts" insurance by charging a "commission" to its members who sign up for UnitedHealth Medigap coverage.**[5]**  Although the

---

**[3]** *See also Multifamily Captive Grp., LLC v. Assurance Risk Manager, Inc.*, 578 F. Supp. 2d 1242, 1247 n.10 (E.D. Cal. 2008).

**[4]** Defendants argue AARP could have not "transact[ed]" insurance as envisioned in Cal. Ins. Code § 1622 because AARP is not UnitedHealth's "agent" or "ostensible agent," as respectively defined in sections 2299 and 2300 of the California Civil Code.  Br. of Appellees 19–21.  However, Cal. Ins. Code § 1622 does not use the term "agency," ostensible or otherwise.  In any event, Cal. Ins. Code § 1633 broadly proscribes all unlicensed transactions of insurance.

**[5]** The acceptance of an insurance commission constitutes "transacting" insurance.  The Insurance Code expressly excludes from activities exempt from the licensing requirements those for which a commission is paid.  Cal. Ins. Code § 1635; *see also id.* § 1634(b), (g), (h) (exempting certain persons from licensure provided they are not paid

Insurance Code does not define "commission," California's Labor Code defines "commission wages" as "compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount of value thereof." Cal. Lab. Code § 204.1 (addressing commission wages in context of employees at car dealerships); *see also Wayne v. Staples, Inc.*, 37 Cal. Rptr. 3d 544, 554 (Ct. App. 2006) (relying on Labor Code's definition of "commission wages" in assessing whether a fee retained in connection with the sale of an insurance product constitutes a commission for purposes of the Insurance Code). If, as Friedman alleges, the 4.95% fee is an insurance "commission" and not a royalty, its retention by AARP could plausibly violate California law.

Defendants argue that the fee AARP receives does not meet that definition of "commission" because UnitedHealth's payment to AARP "is calculated as a percentage of all premiums paid in connection with the program, regardless of their source." Br. of Appellees 6, 28. While seemingly true, given Friedman's allegations, we are not persuaded that the method of calculation, in and of itself, places the arrangements between AARP and UnitedHealth outside the definition of "commission." Significantly, Friedman alleged that "[a]ny consumer who wants to purchase Medigap coverage from UnitedHealth must purchase the AARP Medigap plan." Compl. ¶ 37, ER 18. Therefore, every enrollee in UnitedHealth's Medigap program signed up for the program through AARP and remits their monthly payments to AARP (specifically, the AARP Trust). Accordingly, we see no "source" other than through AARP

commissions). Clearly, the legislature intended those accepting insurance commissions to be licensed.

for the premiums paid to UnitedHealth for Medigap coverage. At this early stage of litigation, it appears that, in practice, the fee received by AARP *is* directly tied to the portion of policies "sold" by AARP, and is, in effect, a "percent of the price of the product," *Wayne*, 37 Cal. Rptr. 3d at 553. Regardless of the nominal form of the arrangement called for by the AARP-United Agreement, the complaint alleges that AARP receives a 4.95% fee for every member that enrolls in UnitedHealth's Medigap program. At the motion to dismiss stage, we conclude that Friedman has plausibly alleged this payment to be a "commission."

The complaint contains other allegations lending further support to the contention that AARP's fee is an insurance commission rather than a royalty. As previously noted, AARP's CEO testified to Congress that "royalties have nothing to do with the premiums of beneficiaries," and that "[n]one of the money is taken out of any of the premiums," Compl. ¶ 63, ER 27–28, and AARP recharacterized the fee as a "royalty" (rather than an "allowance") following settlement of a dispute with the IRS. Compl. ¶¶ 45–46, ER 20–21. Additionally, according to the complaint, other associations with insurance structures similar to AARP's, such as the automobile club AAA, acquire a license to act as an insurance agent, Compl. ¶ 9 & n.1, ER 14. In sum, we conclude that Friedman has met the not especially onerous burden imposed at the pleading stage of alleging facts making it plausible that AARP transacts insurance by collecting commissions from its members who purchase UnitedHealth's Medigap policy.

Second, Friedman also adequately alleged that AARP "solicits" insurance in violation of the Insurance Code. Most significantly, AARP's marketing materials, which AARP

owns and controls,[6] expressly state in bold font: "**This is a solicitation of insurance.**"[7]    Next, the AARP-United Agreement itself envisions that certain AARP member communications may constitute "solicitation materials." *See supra* note 6.    Additionally, the AARP Trust's governing document contractually obligates AARP to "solicit" its members' participation in the UnitedHealth Medigap program.    Finally, AARP's marketing materials contain language that a reasonable observer could plausibly interpret as soliciting his or her business.    For example, AARP's marketing documents explain why members should "get an AARP Medicare Supplement Plan," and then list supporting reasons. ER 276.  AARP's website also allows consumers to "View Plans and Pricing" and call a toll-free number to speak to an insurance agent and "receive complete information including benefits, costs, eligibility requirements, exclusions and limitations." ER 276.  In light of AARP's direct financial incentive in securing additional enrollees in UnitedHealth's Medigap program, we have little difficulty in concluding that these representations support plausible allegations of solicitation.

---

[6] Section 7.2.1 of the AARP-United Agreement states as follows: "All communications to AARP members pertaining to the [Medigap program], including without limitation scripts, solicitation materials and other written materials mailed on behalf of AARP to any members, shall be the property of AARP[.] . . .    United acknowledges that it has no proprietary or ownership rights in any of such materials . . ."  ER 109.

[7] Defendants' response that they are required to include this language pursuant to California law seems to us to in fact be an admission that AARP solicits insurance.  *See* Cal. Ins. Code § 10192.20(b)(3) (requiring the solicitation disclosure if "a purpose of marketing is the solicitation of insurance").

Despite the foregoing, the district court concluded that the complaint failed to adequately allege that AARP "solicits" insurance. The court's primary rationale was that "none of those websites permits an individual to purchase insurance coverage or submit an application for insurance." ER 6.[8] We are not persuaded, however, that the ability (or lack of ability) to directly purchase or apply for insurance is dispositive. While the California Insurance Code does not define "solicitation," various provisions of the Code suggest that the California legislature intended "solicitation" to encompass both requests for "applications for [insurance] contracts," Cal. Ins. Code § 1611, and marketing if the "purpose of the method of marketing is the solicitation of insurance" by putting consumers in contact with an insurance agency or company, Cal. Ins. Code § 10192.20(b)(3). Because the UCL sweeps broadly, *People ex rel. Harris*, 329 P.3d at 188, we decline to adopt the narrow construction of "solicitation" used by the district court. Even if consumers cannot directly apply for or purchase insurance through AARP, Friedman has plausibly alleged that AARP's marketing materials are designed to lead its members to contact UnitedHealth to consummate sales of insurance.

Next, the district court found it significant that the AARP marketing materials state that "[n]either AARP nor its affiliates is the insurer" and that "AARP and its affiliates are not insurance agencies or carriers." ER 6–7 (internal quotation marks omitted). These assertions by AARP are hardly dispositive, especially when they are made in concert with contrary assertions in marketing materials that "**This is**

---

[8] This conclusion was based on documents Defendants attached to their motion to dismiss, ER 267–79.

**a solicitation of insurance.'"[9]**  An unlicensed entity violates
sections 1631 and 1633 when it, in fact, solicits insurance,
irrespective of whether it self-reports as an "agent" or an
"insurer." Section 1631 is expansive, providing that "a[n]
[unlicensed] *person* shall not solicit, negotiate, or effect
contracts of insurance, *or* act in any of the capacities defined
in Article 1 [defining 'insurance agent']."  Cal. Ins. Code
§ 1631 (emphases added).  Moreover, as we have noted,
section 1633 prohibits "transacting" insurance without regard
to agency status.[10]

In light of AARP's self-described "solicitation[s] of
insurance," as well as its contractual obligation to "solicit"
membership into the UnitedHealth Medigap plan, Plaintiff
stated a plausible claim at the motion to dismiss stage that
AARP "solicits" insurance without a license, and, as a
consequence, committed an unlawful act in violation of the
UCL.

---

[9] Moreover, even if one could not "solicit" without being an agent or
an insurer, the statements on Defendants' marketing materials would
conflict.  At this stage of the litigation, the district court was required to
credit Plaintiff's interpretation of those statements. *See Rowe*, 559 F.3d
at 1029–30.

[10] The district court also concluded that AARP's actions were
permissible in part because "a group policyholder, such as AARP, is
entitled to 'offer[] insurance' to its members" pursuant to section
10270.5(a)(3) of the Insurance Code.  ER 7.  However, this ignores
Friedman's argument, grounded in the complaint, that "AARP went
several steps further than the passive role played by group policyholders
under the Insurance Code."  Br. of Appellant 12.

**B**

Having found that Friedman adequately alleged that Defendants violated the UCL's "unlawful" prong, we also conclude Friedman adequately alleged that Defendants violated the "fraudulent" and "unfair" prongs of the UCL. To state a claim under either prong, a plaintiff's "burden of proof is modest: the representative plaintiff must show that members of the public are likely to be deceived by the practice." *Prata v. Superior Court*, 111 Cal. Rptr. 2d 296, 308 (Ct. App. 2001). We assess likelihood of deception under a "reasonable consumer standard." *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). We recently held that this inquiry "raises questions of fact that are appropriate for resolution on a motion to dismiss only in 'rare situation[s].'" *Id.* (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008)). Further, to establish a fraud claim under the UCL, a plaintiff must demonstrate actual reliance. *In re Tobacco II Cases*, 207 P.2d 20, 39 (Cal. 2009). However, "actual reliance [for purposes of a UCL claim] . . . is inferred from the misrepresentation of a material fact." *Chapman v. Skype, Inc.*, 162 Cal. Rptr. 3d 864, 874 (Ct. App. 2013). Finally, the California Supreme Court has emphasized that a "misrepresentation is judged to be 'material' if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact." *In re Tobacco II Cases*, 207 P.2d at 39 (internal citation and quotation marks omitted).

Friedman has plausibly alleged that members of the public are likely to be deceived into paying AARP's additional 4.95% fee because AARP collects and labels the

fee as a "royalty" rather than what Friedman alleges it actually is—a "commission" collected on top of the premium. At the motion to dismiss stage, these allegations are adequate to establish material misrepresentations supporting Plaintiff's claims.

Defendants contend that Friedman failed to allege deception. We disagree. Friedman alleged that AARP deceives its members into believing that members' monthly payments are for AARP's regulator-approved premiums and administrative expenses but actually include the additional commission. As support, Friedman points to an "AARP Medigap disclaimer" that states: "These premiums are used to pay expenses incurred by the Trust in connection with the insurance programs and to pay the insurance company for your insurance coverage." Compl. ¶ 67; ER 29–30 (internal quotation marks omitted). Accordingly, he contends, AARP misleadingly told its members that their payment only covered AARP's expenses and the premium for UnitedHealth's Medigap coverage, but in reality, the payments include an imbedded commission which was not an expense payment. We agree that these allegations plausibly allege deception. Defendants also disregard Friedman's allegation that it was deceptive for AARP to characterize its fee as a royalty in the first place. Compl. ¶ 8, ER 13 ("[c]alling the commission payment a 'royalty' is merely a fiction created by Defendants to further their illegal scheme").

Next, Defendants argue that the ultimate rate Friedman was charged was precisely in line with rates approved by the California Insurance Code, and therefore they cannot be deceptive. In fact, they argue, the rate was expressly authorized by California regulators and Defendants were

prohibited from deviating from that rate.  This argument fails because it disregards Friedman's numerous allegations that the 4.95% fee was, in fact, charged on top of any regulator-approved premium.  And, this allegation is supported with reference to language in the AARP-United Agreement.  Specifically, the Agreement defines "SHIP GROSS PREMIUMS" for purposes of the AARP Medigap Plan, as "the amount of Member Contributions *minus* the AARP allowance."  ER 68 (emphasis added); *see also* ER 99 (describing the "AARP allowance" as "an allowance for AARP's sponsorship of the SHIP and the license to use the AARP Marks in connection therewith").  That language makes it seem quite plausible that, as Friedman alleged, the premium that AARP charges does not include the AARP allowance.  Friedman's allegation is further supported by testimony to Congress from AARP's CEO that "royalties have nothing to do with the premiums of the beneficiaries," and that "[a]ll of the money that we have that comes out of the trust in interest goes to our mission.  None of the money is taken out of any of the premiums."  Compl. ¶63, ER 28–29.

Next, Defendants argue Friedman failed to sufficiently allege actual reliance.  However, as discussed, "actual reliance . . . is inferred from the misrepresentation of a material fact."  *Chapman*, 162 Cal. Rptr. 3d at 874.  Accordingly, to have alleged reliance on Defendants' misrepresentation of material facts, Friedman only needed establish it to be plausible that a "reasonable man would attach importance to [their] existence or nonexistence in determining his choice of action in the transaction in question."  *In re Tobacco II Cases*, 207 P.3d at 39; *see also id.* (whether a misrepresentation is sufficiently material to allow for an inference of reliance "is generally a question of fact unless the fact misrepresented is so obviously

unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it").

Friedman alleges that the misrepresentations he catalogued in his complaint concerning the 4.95% fee were material because they induced him to purchase Medigap through AARP rather than from other insurers who "do not secretly charge unlawful insurance agent commissions to consumers." Compl. ¶ 77, ER 31. We think that it is not, as a matter of law, an "obviously unimportant" consideration for a reasonable purchaser of insurance to know that an undisclosed fee charged to a group insurance policyholder would be collected in addition to—rather than from—the actual cost of the insurance. *See In re Tobacco II Cases*, 207 P.3d at 39. For these reasons we conclude that Friedman's complaint should not have been dismissed.

As a final matter we note that one of Defendants' principal contentions below was that Friedman's claim is barred by the "filed-rate" doctrine, under which "rates duly adopted by a regulatory agency are not subject to collateral attack in court." *MacKay v. Superior Court*, 15 Cal. Rptr. 3d 893, 910 (Ct. App. 2010). Because the district court concluded that the complaint failed to state a claim it saw no need to reach this issue. ER 4–5 n.2. Moreover, neither party addressed the doctrine in its appellate briefing.

In light of our conclusion that the complaint should not have been dismissed, the "filed-rate" issue reemerges. Our general rule is that we do not consider an issue not passed upon below. *Dodd v. Hood River Cty.*, 59 F.3d 852, 863 (9th Cir. 1995). We do not think this case calls for deviation from that rule and we conclude that the proper course is to have the district court address the issue in the first instance.

## CONCLUSION

We **REVERSE** and **REMAND** for further proceedings consistent with this opinion.