Filed 9/7/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WILLIAM BRADY, | |
| Plaintiff and Appellant, | G053847 |
| v. | (Super. Ct. No. 30-2016-00839608) |
| BAYER CORPORATION et al. | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, William D. Claster, Judge. Reversed.

The Cooper Law Firm, Scott B. Cooper and Samantha Smith for Plaintiff and Appellant.

Sidley Austin, David R. Carpenter; Jonathan F. Cohn and Joshua J. Fougere for Defendants and Respondents.

Xavier Becerra, Attorney General, Nicklas A. Akers, Assistant Attorney General; Michele Van Gelderen and Hunter Landerholm as Amicus Curiae on behalf of Plaintiff and Appellant.

## I.  INTRODUCTION

In 1925, Merck Pharmaceuticals sent a letter to Morris Fishbein, chairman of the Journal of the American Medical Association.  The letter said, "We have been recently startled by the unexplainable demand on the part of our customers for Sodium Borate C. P. Powder.  From our representatives, we have learned that a Dr. Brinkley, of Milford, Kansas, has broadcast recommendations for the use of Merck's Sodium Borate C. P. in obesity, and we have been literally swamped with orders, not only from the trade, but also from the laity.  [¶] We have taken action by notifying our . . . customers, as well as our sales staff and such retail druggists as have inquired of us regarding the product, strongly discouraging the use and sale of this material for the above mentioned purpose, as we are cognizant of the dangers involved in the internal administration of Sodium Borate."[1]

It's been almost a hundred years since Merck sent that letter – responding to demand created by a charlatan with no formal medical training whose license to practice had been revoked in several states, but who had his own radio station and was making a fortune peddling unfounded remedies to unsuspecting citizens with little or no access to doctors.  Since then, Americans have learned to resist such hucksterism and rely not only upon their personal physicians and organizations like the AMA, but upon pharmaceutical companies whose closely regulated research, production, and merchandising have taken the place of expertise the average citizen is unable to develop.

So when consumers find a reputable company offering them vitamins – a company with 75 years of brand recognition, now owned by an international pharmaceutical company respected all over the world – they can be expected to adhere to that company's advice.  And when that company suggests, as it has with its products since 1949, that one vitamin pill a day is sufficient, it cannot then rely upon individual

---

[1]        Pope Brock, Charlatan, Chapter 25 (2009).

consumers reading the small – indeed miniscule – print on the back of its label to learn that instead of ONE A DAY, they should be taking two.

Much has changed since 1925 but we find nothing to suggest the public does not still expect that kind of responsible entrepreneurism from Merck – now a division of respondent Bayer – as well as the rest of the industry we entrust daily not just with goods and services but with our lives. So in this case we conclude Bayer has failed to appreciate the degree to which their trade name One a Day has inspired reliance in consumers, and we hold an action alleging they violated California's Consumer Legal Remedies Act (CLRA, Civ. Code § 1770), Unfair Competition Law (UCL, Bus. & Prof. Code, § 17200) and express warranty law (Com. Code, § 2313) should have survived demurrer.

As we will explain, we are well aware that two federal district courts have reached a different decision. In both *Howard v. Bayer Corp.* (E. D. Ark. July 22, 2011) 2011 U. S. Dist. LEXIS 161583 (*Howard*) and *Goldman v. Bayer* AG (N. D. Cal. 2017) 2017 U. S. Dist. LEXIS 117117 (*Goldman*) a bench officer saw this case differently than we do. But both cases are based on what we think is an untenable proposition: that the market for vitamins is undifferentiated; that the hypothetical "reasonable consumer" would, *as a matter of law*, examine the makeup of a daily vitamin supplement; that such a consumer would not rely upon the expertise of pharmacologists and doctors but would instead analyze the various concentrations of vitamins and minerals in each brand and draw a personal conclusion about which ingredients he/she needed in a daily vitamin supplement. We find nothing in law or experience to support that conclusion.

FACTS

Bayer AG (Bayer; the "AG" stands for Aktiengesellsschalft[2]), maker and marketer of One A Day brand vitamins, was sued in Orange County Superior Court for alleged violations of California's Consumer Legal Remedies Act, Unfair Competition Law and express warranty law. Plaintiff Brady's theory is that Bayer's packaging of its "Vitacraves Adult Multivitamin" line of gummies is misleading. As Brady inveighs, despite the One A Day brand name, these particular vitamins require a daily dosage of *two* gummies to get the recommended daily values. Thus buyers end up receiving only half the daily vitamin coverage they think they are getting.

The initial complaint was filed as a class action in March 2016, followed by an amended complaint in April, followed by a demurrer in May. The trial court, relying on the unpublished *Howard v. Bayer Corp.* decision mentioned above, involving these very facts – the supposedly misleading packaging of Bayer's One A Day gummies – sustained Bayer's demurrer without leave to amend.[3]

The problem is best represented by showing the product. So we reproduce here photos of the front and back of the bottles at issue:

---

[2]     According to *Sabal Ltd. LP v. Deutsche Bank AG* (W.D. Tex. 2016) 209 F.Supp.3d 907, 913, footnote 1, "Aktiengesellschaft translated to English refers to a German public limited company whose shares are offered to the general public and traded on a public stock exchange."

[3]     In 2017, another federal judge reached the same decision. That is the *Goldman* case, which relied upon and amplified *Howard*.

4



Now the back:



While we cannot provide photos large enough to enable the reader to make it out, the line above the words "Supplement Facts" (the listing of vitamins and minerals provided by each gummie) says – in the smallest lettering on the bottle, an ocular challenge even when the bottle is full-sized and held in good light – "**Directions**: Adults and children 4 years of age and above.  **Chew** two gummies daily."  The issue before us is whether that language is enough to overcome the prominent and arguably advisory brand name of the product.  We think not.

## DISCUSSION

Our problem with Bayer's position is twofold.  It seems to us to suffer from infirmities both factual and legal.  The factual infirmity is that it requires us to accept the proposition that consumers do not rely on the expertise of One A Day when they buy vitamins.

One A Day has spent 75 years convincing the public they could be trusted to divine its vitamin needs.[4]  Most of the California consumers to whom One A Day sells have spent *literally* their entire lives listening to One A Day tell them, essentially, "Trust us.  We know what you need.  You will never know as much about vitamins as we do, but you can rely on us.  Take one of our tablets every day and you won't need any other supplements."

And for all we know, that's absolutely true – except for the one tablet part. Presumably the One A Day formula represents the collective experimentation and wisdom of a host of medical professionals – doctors, pharmacologists, biochemists – who have concluded that certain levels of the substances in these formulas are the optimum levels for most of us.  We have no reason to doubt the accuracy of One A Day's research or the formulations based on it.  And it appears the consumers of California have concluded that One A Day is a company they can trust:  You don't hang around for 75 years if people don't buy your product.

But now Bayer wants us to conclude that trust is not part of One A Day's success.  They argue that modern consumers carefully read and analyze the formulations of the vitamins on the market and make their choices based upon their own expertise. They tell us – and the federal judges who accepted their arguments in *Howard* and *Bayer* – that consumers "look for the nutritional values" on the label and choose the supplements they buy based on comparison of those nutritional values.  Instead of relying upon lifelong experience that One A Day is a trustworthy company that has been studying and analyzing our health needs for decades and has much more knowledge about those things than laypeople, Bayer says consumers look at the label and decide just how much selenium, biotin, pantothenic acid and zinc they need and then make their purchase after comparing those values with the labels on the vitamin bottles.

---

[4]        One a Day website home page.

That's a stretch.

But as problematic as that factual depiction is, we must stretch much further to adopt Bayer's legal position. We must conclude that consumers do that *as a matter of law*.

This case has arrived here via sustained demurrer. To affirm the court below, we would have to conclude that even if plaintiff's allegations are true, there is no cause of action. (*Beacon Residential Community Assn. v. Skidmore, Owings, & Merrill LLP* (2014) 59 Cal.4th 568, 571.) We would have to conclude that the market for vitamins is undifferentiated, and that a hypothetical "reasonable consumer" would, *as a matter of law*, necessarily look behind the front label of a jar of Bayer's One A Day gummies and in the course of that action, would discover that not one gummie but two is what the company recommends.

We have been unable to reach that point. Not all reasonable vitamin buyers can be said to be alike as a matter of law. Some consumers would scoff at what they might consider the paltry daily dosage recommendations of One A Day; they might believe they need much higher amounts.[5] Or lower. Those are the consumers Bayer has in mind – the ones who scrutinize the back ingredients label to assure themselves they are buying the amounts they, or their health care provider, think are needed. But other reasonable consumers will consider the daily dosages recommended by Bayer and the FDA to be just fine – they might even consider those numbers a safe way to avoid against any danger of ingesting too much – and will rely upon the name they have come to trust.

"Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on demurrer." (Quoting *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1472; *Committee on Children's Television,*

---

[5]    See *National Nutritional Foods Assoc. v. Food & Drug Administration* (2d Cir. 1974) 504 F.2d 761, 789 (*National Nutritional I*) [some consumers want higher dosages].

*Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197 [finding demurrer inappropriate in case where parents alleged deceptive advertising of sugar cereals].) (*Linear Technology Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 134-135.) For this reason, we conclude the demurrer was improvidently granted.

A. *Precedent Bearing on the UCL and CRLA Claims*

The case law involving misleading product labels is varied, with decisions covering most points of the compass. The case law is further complicated by the fact that some kinds of products are subject to special legislation or regulation, including federal preemption. (See e.g., *Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 950-956 [state wine labeling statute not preempted by federal law] (*Bronco Supreme*); *Simpson v. The Kroger Corp.* (2013) 219 Cal.App.4th 1352 [claim based on federal definition of butter] (*Simpson*); *Pelayo v. Nestle USA, Inc*. (C.D. Cal. 2013) 989 F.Supp.2d 973, 975, fn. 2 [differentiating, for purposes of federal preemption, pasta products involving chicken from those that did not because of federal poultry regulations]; *Gitson v. Trader Joe's Co.* (N.D. Cal. 2013) 2013 U.S. Dist. LEXIS 144917 [claim based on federal definition of milk] (*Gitson*); *Hairston v. South Beach Bev. Co., Inc.* (C.D. Cal. 2012) 2012 U.S. Dist. LEXIS 74279, p. 8-9 [claims involving use of the word fruit in flavored waters preempted because federal regulations explicitly allow manufacturers to use name and images of fruit even if the product doesn't contain any fruit at all] (*Hairston*); see also *Janney v. Mills* (N.D.Cal. 2013) 944 F.Supp.2d 806, 811-815 [declining to apply primary jurisdiction doctrine where federal agency would have initial decisionmaking responsibility in light of agency's own repeated refusal to "promulgate regulations governing the use of 'natural' as it applies to food products"] (*Janney*).)

Moreover, special state legislation about a product important to California's economy may sometimes affect a court's analysis of a misbranding claim. (See *Bronco Wine Company v. Jolly* (2005) 129 Cal.App.4th 988, 1023-1024 [importance of protecting the "Napa Valley" name reflected in Business and Profession Code section

25241] (*Bronco Appellate*); cf. *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077 [judgment in favor of salmon farmers reversed because "plaintiffs' claims for deceptive marketing of food products are predicated on state laws establishing independent state disclosure requirements 'identical to' the disclosure requirements imposed" by federal law].)

This complicates our analysis, but doesn't change it. Our canvassing of the relevant case law involving CRLA and UCL claims focused on allegedly misleading labels (including allegedly misleading brand names) reveals four discrete themes which aid the analysis of any misleading label claim. None of them supports respondents.

1. *Common Sense*

We will begin with a theme that, almost by definition, favors defendant product makers: If a claim of misleading labeling runs counter to ordinary common sense or the obvious nature of the product, the claim is fit for disposition at the demurrer stage of the litigation.[6] The breakfast cereal cases are good examples of the triumph of common sense in this context. The idea that a picture of Captain Crunch holding a spoon full of berries on a cereal box promises real fruit in the cereal carton received a dismissive "Nonsense" in *Werbel v. Pepsico, Inc.* (N.D.Cal. 2010) 2010 U.S. Dist. LEXIS 76289, p. 9 (*Werbel*).

Likewise, the thought that Kellogg's Froot Loops – note "froot," not even "fruit" – contains any measurable amount of actual, nutritious fruit is an idea not to be taken seriously. (See *Videtto v. Kellogg USA* (E.D. Cal. 2009) 2009 U.S. Dist. LEXIS 43114; *McKinniss v. Kellogg USA* (C.D.Cal. 2007) 2007 U.S. Dist. LEXIS 96106 (*McKinniss*).) Similarly, the idea that crackers falsely promised a substantial amount of vegetables got the common sense boot in *Red v. Kraft Foods, Inc.* (C.D.Cal. 2012) 2012

---

[6] Since many of these cases are decided in the federal courts, the rough equivalent is the Federal Rule of Civil Procedure rule (12)(b)(6) stage. (See *11601 Wilshire Associates v. Grebow* (1998) 64 Cal.App.4th 453, 457.) All references to "(12)(b)(6)" in this opinion are to the Federal Rules of Civil Procedure.

U.S. Dist. LEXIS 164461 (*Red*). To be sure, those crackers were, in fact, "made" with "real vegetables" – well, some small amount of "real vegetables" at least. But it was still a box of *crackers* and, as the court noted, everyone knows crackers are not "composed of *primarily* fresh vegetables." (*Id.* at p. 10 (italics added).)

Common sense also carried the day in *Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295 (*Hill*). Putting a "green drop" on a bottle of Fuji Water did not convey the promise the water had been independently evaluated by an environmental watch dog group as somehow environmentally superior to other water. (*Id.* at p. 1307.) The idea the drop conveyed a promise of independently evaluated environmental superiority was just wishful thinking on the plaintiff's part. (See *id.* at p. 1303-1304.)[7] Cases such as these are demurrable.

2. *Literal Truth/Literal Falsity*

Literal truth can sometimes protect a product manufacturer from a mislabeling claim, but it is no guarantee. The crackers in the *Red* case were indeed "made with real vegetables" but that promise, while true, meant nothing in context. The court left little doubt that had the promise of a cognizable amount of vegetable nutrition made any sense in connection with crackers, the outcome of the case might well have been different despite the *literal* accuracy of the claim.

Another example of a true statement that doesn't mean much – so no reasonable consumer would in fact be misled – is a conditionally but literally true statement of the if-pigs-had-wings variety. Such a statement defeated a UCL claim in *Freeman, supra*, 68 F.3d 285, a sweepstakes come-on case. There the question was whether reasonable people would think they had already won a fortune based on a statement that *if* they returned the winning number they would receive about $1.7

---

7        Another case that illustrates the wishful thinking strain in plaintiffs' claims is *Freeman v. Time, Inc.* (9th Cir. 1995) 68 F.3d 285 (*Freeman*), involving the promise of having won a million dollar plus sweepstakes. We discuss *Freeman* shortly as an example of a situation where being literally true is enough to dispose of the misleading claim at the pleading stage.

11

million?  The court said no.  (See *id*. at p. 287.)  The word "if" made all the difference.  (See *id*. at p. 289 [claim defeated by "qualifying language" that was not "hidden or unreadably small"].)

But there is no protection for literal falseness.  We note that even as plastic a term as "natural" could not excuse the uses of high fructose corn syrup, high maltose corn syrup or maltodextrin in five named granola bars in *Janney*, *supra*, 944 F.Supp.2d 806, 817-818 [denying 12(b)(6) motion with regard to plaintiffs' fraud claims based on those products].

And in a battle between detergent colossi, *Clorox Co. v. Proctor & Gamble Commer. Co.* (1st Cir. 2000) 228 F.3d 24 (*Clorox*), the First Circuit held the Spanish brand name "Ace con Blanqueador" – literally, "Ace with Whitener" – was misleading because it was *literally false* in context.  It contained no whitening agents.  (*Id*. at p. 36.)

Literal falsity was also the key to this court's majority opinion in *Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254 (*Kwikset Appellate*), involving locks with made-in-USA labels.  Those locks might have been mostly or "substantially" made in the United States, but they weren't *completely* made here – as promised; some screws and pins in the assembly were made in Taiwan.  Those few parts were sufficient to state a cause of action.  (See *id*. at p. 1264.)

3. *The Front-Back Dichotomy*

A third theme in the case law is the degree to which qualifiers in the packaging can ameliorate any tendency of the label to mislead.  Five cases nicely illustrate the fact that sometimes what is said on the back of a package makes a difference.  This strikes closer to home, but turns out not to help respondents.

The first is an especially perceptive decision of the Ninth Circuit (applying California consumer law) in *Williams v. Gerber Prods. Co.* (9th Cir. 2008) 552 F.3d 934 (*Williams*).  The baby food maker had marketed a product for toddlers.  It was packaged as "Fruit Juice Snacks Naturally Flavored Rich in Vitamin C" on the front side, including

12

a picture of a variety of fruits. (The court reproduced a picture of the product, see *id*. at p. 941.) One had to turn to the back side to discover that the only "fruit juice" in those "snacks" was "white grape juice from concentrate" and the two most prominent ingredients were "corn syrup and sugar" (the opinion noted the sugar was refined white sugar, at that).

In *Williams*, the court held the fact the back side of the product disclosed that concentrated white grape juice was the only juice in the product could not cure the misleading nature of the front side. (See *Williams, supra*, 552 F.3d at p. 939.) It explained that the point of ingredient lists on the back should be to *confirm* the implied representations on the front, not contradict them. It said, "We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that *confirms* other representations on the packaging." (*Williams, supra*, 552 F.3d at pp. 939-940, italics added.) The holding was that a back label that did not *confirm* what was on the front label could not defeat a pleading stage challenge to the plaintiff's UCL, CRLA, false advertising and warranty claims. (*Williams, supra*, 552 F.3d at pp. 939-940.)

Another front-back case with the same approach as *Williams* involved a marketer's effort to call a product "organic" on the front while qualifying the word on the back: *Brown v. Hain Celestial Group, Inc.* (N.D.Cal. 2012) 913 F.Supp.2d 881 (*Brown Organic*). Again, the back qualifier didn't work.

Specifically, in *Brown Organic* a brand of cosmetic products used the word "organic" in the brand name "Jason and Avalon Organics." However, the products were not even "predominately" made from organic ingredients. (*Brown Organic, supra*, 913 F.Supp.2d at p. 885.) Though the "entire label" was not before the court in the defendant's 12(b)(6) motion (presumably the "entire label" would have revealed the

13

relatively low organic content of the products) the court was clear that the use of the word "organic" combined with the "pure, natural and organic" tagline did not allow a conclusion that no reasonable consumer could be deceived *as a matter of law*. (*Id*. at p. 898.) It further held the same misleading stress on the word "organic" on the front label allowed a claim under Calfornia's own Organic Products Act (COPA) to survive as well. (*Id*. at pp. 895-898.)[8] So again, a back label ingredients list that conflicted with, rather than confirming, a front label claim could not defeat an action.

Three cases contrast with *Williams* and *Brown Organic*, but actually support this analysis because both involved qualifiers sufficiently prominent on the *front* of the product: *Simpson, supra,* 219 Cal.App.4th 1352; *Gitson, supra,* 2013 U.S. Dist. LEXIS 144917; and *Shaker v. Nature's Path Foods, Inc.* (C.D.Cal. 2013) 2013 U.S. Dist. LEXIS 180476 (*Shaker*).)

*Simpson* involved a challenge to the packaging of "Challenge Butter," on the basis that the Challenge brand's "spreadable butter" contained olive oil, canola oil, or both, in seeming contradiction to federal and state laws that do not allow "butter" to contain olive or canola oil. (See *Simpson, supra*, 219 Cal.App.4th at pp. 1359, 1362-1364.) As the reproductions of the front and top of the relevant tubs of spreadable butter pictured in the opinion readily show, the fact the product wasn't only milk and cream (and maybe some salt) was unavoidably clear just from looking at either the front or top. (See *Id.* at pp. 1373-1377 [appendix reproductions].) There was no need to look at the back. The content of the product was abundantly clear.

---

8      Citing Health and Safety Code section 110839, the maker of Jason and Avalon's Organics asserted California law "permits products with less than 70% organic content to be 'sold as organic' if the organic content is identified only on the ingredient statement or information panel and in accordance with additional conditions." (*Brown Organic, supra,* 913 F.Supp.2d at p. 896.) The argument failed. (See *Id.* at pp. 895-896 ["COPA is unambiguous on this point and the court agrees that Plaintiffs' allegations are sufficient. Plaintiffs allege that the word 'organics' in the Avalon Organics brand name and the 'pure, natural, and organic' tagline and 'pro-organic pledge' on the Jason brand Products are barred by [Health and Safety Code] section 110838(a) and that neither of the exceptions in [Health and Safety Code] section 110839 apply. The court agrees."].)

14

*Gitson* involved the supposedly misleading use of the word "milk" in a product description "soy milk."[9]  The plaintiff focused on the zealous federal guarding of the word "milk."  (See *Gitson, supra,* 2013 U.S. Dist. LEXIS 144917 at pp. 20-24.)  Given the Food and Drug Administration's (FDA's) standardized definition of "milk," the federal district court rejected Trader Joe's first line of defense, which was that "soy milk" had become its own stand-alone product name.  (*Id.* at p. 22.)  Still, the court ruled nobody could be misled about the product, since the words *lactose free* and *dairy free* not only appeared on the back, but on the *front* of the product as well.  (See *id.* at p. 21.)[10]

And *Shaker*, another cereal box case, turned on the importance of proper disclosure on the *front* of the box.  The front of the box showed a bowl of fresh blueberries, strawberries, a spoon and milk, with the words "strawberries shown as serving suggestion" in all capital letters.  (*Shaker, supra*, at p. 3.)  In fact, the product did not contain strawberries, a fact which generated the suit for misleading advertising.  But the maker was redeemed by its "sizable, easily understood language on the front of the Cereal box," a fact that distinguished it from *Williams*.   (*Shaker, supra*, at p. 13.)

4. *Brand Names Misleading in Themselves*

And finally, the cases most clearly analogous to ours:  Any number of cases have held that brand names *by themselves* can be misleading in the context of the product being marketed.[11]  That's not surprising given that, as Amicus Attorney General points

---

9    The court's handling of the issue could also have been placed in our "obvious common sense" category.

10    Though plaintiff's claims in regard to UCL, CLRA and unfair advertising were all dismissed, leave to amend was allowed.  (*Gitson, supra,* 2013 U.S. Dist. LEXIS 144917 at p. 15.)

The other product packaging at issue in *Gitson* involved various flavors of yogurt in light of their being sweetened with "cane juice."  (*Gitson, supra,* 2013 U.S. Dist. LEXIS 144917 at p. 8.)  This is where the overlay of federal regulations on California consumer remedy law made a difference.  Since FDA regulations specifically allow "cane sirup" (alternative spelling "sirup" used in opinion) to be used in yogurt and since the ingredient list included cane juice (or evaporated cane juice) and since evaporated cane juice is "another name" for cane syrup, there was no viable UCL claim at that stage, though as just noted, leave to amend was allowed.  (*Id.* at pp. 12-13.)

11    Often these involve a challenge to a misleading name from a competitor as distinct from a consumer who claims to have been misled.

15

out, marketing theory emphasizes the use of *descriptive* brand names as a marketing strategy. The advantage of a descriptive brand name is that it requires of the consumer "'little thought, little explanation, little effort to build understanding of what the offering actually is.'"[12] Indeed, the Attorney General notes that in marketing literature there is an awareness that "'Most of the time when people encounter your name, you won't be there to explain it to them. *And they won't have the time or interest to read about it on your website or the back of the box.*'"[13] (Italics added.)

The *Brown Organic* case discussed *ante*, appears to fall into this category. The court there took one look at the "Jason and Avalon Organics" brand name, compared it with the distinctly non-organic ingredients, and ruled for the plaintiffs.

Next consider the "Brown Auto Stabilizer Company," the subject of a federal trade commission case. (See *In the Matter of Brown Auto Stabilizer Co., et al.* 1972 FTC LEXIS 91 (*Brown Stabilizer*).) The company advertised something called a "dynamic absorber," which was supposed to dampen the side sway of a car. The problem was, the product didn't do anything to "stabilize" a car. It had no effect on side sway. An administrative law judge ruled that the company's advertising claims plus "the use of the word 'Stabilizer'" in the "corporate and trade name" to describe the absorber was misleading. (*Id.* at pp. 10-11, 18-19.) The judge ordered the company to cease using the word "Stabilizer" even as "part of the corporate or trade name" to refer to the "device." (*Ibid.*) The Federal Trade Commission upheld the administrative law judge's order that the advertisements and the brand name were false and deceptive. (*Id.* at pp. 36-37.)

Then there is the "Breathasure" case. Despite a froot-loops style misspelling, "Breathasure" was held to be a misleading brand name by the Third Circuit in *Warner-Lambert Co. v. BreathAsure, Inc.* (3d Cir. 2000) 204 F.3d 87, a litigation

---

[12] Amicus Brief of Attorney General, pages 15-16, quoting The Naming Group, Sugestive Names: Debunking the Myth that Descriptive = Easier (2011) p. 2 <http://bit.ly/2nNms4c> [as of May 15, 2017]."

[13] Amicus Brief of Attorney General, page 16, quoting Watkins, Hello, My Name is Awesome: How to Create Brand Names that Stick (2014) at page 8.

initiated by a competitor in the breath-freshening market. There was no "scientific foundation" for the idea that the Breathasure capsules were "effective against bad breath," (*id*. at p. 89.) and the appellate court directed the federal district court to enjoin the defendant from using "'BreathAsure' or 'BreathAsure-D' or any similarly misleading trade name." (*Id*. at p. 97.)

In *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.* (3d Cir. 2002) 290 F.3d 578 (*Novartis*), the Third Circuit found misleading the brand name "Mylanta Night Time Strength" as the designation for an over-the-counter liquid heartburn medicine. Quoting *Clorox*, the *Novartis* court noted a "'literally false' message may be either explicit or 'conveyed by *necessary implication when, considering the advertisement in its entirety*, the audience would recognize the claim as readily as if it had been explicitly stated.'" (*Novartis, supra*, 290 F.3d at pp. 586-587, italics added.) In *Novartis*, the "message of special formulation for nighttime relief that [was] necessarily implied" from the product's name – "Mylanta Night Time Strength" – was held to be "*per se*" false. (*Id*. at p. 590.) There was no evidence it actually remedied nighttime heartburn any better than it did daytime heartburn. (*Ibid*.)

The trade name "Ricelyte" was held misleading by the Seventh Circuit in *Abbott Laboratories v. Mead Johnson & Co.* (7th Cir. 1992) 971 F.2d 6 (*Abbott*). The product, an electrolyte solution marketed for infants suffering from dehydration from acute diarrhea or vomiting, had been refined so far as to cease bearing any resemblance to real world rice. The relationship was, to use the court's analogy, the difference between an auto engine and a vat of molten steel. The two are "completely different things, both physically and functionally." (*Id*. at pp. 9-10.)

And buyers of an energy drink were class-action plaintiffs in *In re 5-hour ENERGY Marketing and Sales Practices Litigation* (C.D. Cal. 2014) 2014 U.S. Dist. LEXIS 149732 (*5-Hour Energy*).) There, a claim that "the 5-hour ENERGY" name was misleading under California's false advertising law survived the pleading stage. (See *id*.

17

at p. 47.)  The allegation was simply that it did not give consumers "five hours of energy."  (*Ibid.*)

B.  *Application*

So where does all this lead us – other than to eyestrain and fatigue?  It leads us to conclude that all four themes that emerge from the case law uniformly point to the same result in this case:  allowing Brady's claim to proceed beyond the pleading stage.

Here's how we break it down:  1.  *Common sense*:  Bayer's One A Day gummies cannot be said, as a simple application of common sense, to indicate that two gummies a day are required.  Indeed, common sense flows in the other direction:  If the label prominently displays the words "One A Day" there is an implication that the daily intake should be one per day.  2.  *Literal truth*:  In the context of its gummie product, the One A Day brand name is literally false.  A consumer seeking to get the "one a day" amount of vitamins associated with the brand's capsules will not take *one a day*.  4.  *Nature of the brand name:*  "One A Day," when it comes to gummies, is explicitly misleading.  Even judges can do enough math to know two does not equal one.

But the most damaging of these themes to Bayer's position in our case is 3, *the front-back problem*.  The front of the product makes no attempt to warn the consumer that a one-a-day jar of gummies is in fact full of two-a-day products.  One must look at the back of the jar, in small print in the upper right hand corner, to receive the direction to "**Chew**:  two gummies daily," making a "Serving Size" is indeed two gummies.  And unlike the billboard, sunburst-backed brand name print, that information is printed in nano-type.

Bayer tries to turn the "serving size" fine print on the back into a virtue by asserting that *of course* the customer must look at the back because "The only place to learn about the serving size, the vitamins, or the amount of vitamins is on the back."  We are unpersuaded.  That might be the case if this product were called Gazorninplat

18

Gummies or Every Day Gummies. But it is most decidedly not the case here. The front label fairly shouts that one per day will be sufficient.

Bayer feels the reasonable consumer will be so motivated to ascertain the precise amounts of vitamins that *of course* he or she will scrutinize the back. We don't think such a conclusion can be made as a matter of law at the pleading stage. Nothing in law or logic suggests consumers will take such a belt and suspenders approach, and Bayer's argument runs counter to an important insight from the *Williams* opinion: You cannot take away in the back fine print what you gave on the front in large conspicuous print. The ingredient list must *confirm* the expectations raised on the front, not contradict them.

The cases we have reviewed that favor marketers are inapposite here. Unlike those, there is nothing to suggest Bayer's brand name is not be taken seriously. The idea that a "One A Day" gummie can be packed with as much vitamin wallop as the traditional One A Day capsule, lacks the common-sense risibility that sank plaintiffs' claims in the Captain Crunch, Froot Loops, or vegetable crackers cases. Nor is there the wishful thinking that characterized the plaintiff's claims in *Freeman*, *Hill*, or *Shaker*. A reasonable consumer might very well think it possible, in the early 21st Century, to package a full day's supply of vitamins in one gummie. Certainly this court – made up of reasonable consumers – has no sense of whether that is or is not possible.

Nor can Bayer claim the compliance with literal truth that protected the manufacturers in *Red*, *Freeman*, *Rooney*, and *Romero*. It is simply specious to assert that One A Day carries any literal truth here, and no wishful recharacterization of the brand name as "one portion a day" or "one serving a day" can fix that. Indeed, the use of the procrustean concept of "serving size" to disguise the amount needed strikes us as similar to the use of the word "natural" in *Janney*: stretched beyond what the rest of the product explicitly or impliedly offers.

19

Finally, the cases where an implied promise was qualified by additional language on the package, *Simpson* (butter) and *Gitson* (soy milk) involve prominent language on the front, or front and top of the product, not fine print on the back. The insightful *Williams* case is more similar to our facts than either of those.

In fine, "these laws prohibit 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.' (*Leoni v. State Bar* (1985) 39 Cal.3d 609, 626.) Thus, to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, 'it is necessary only to show that "members of the public are likely to be deceived."' (*Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d at p. 211; accord, *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267.)" (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 951.) We cannot say there was no "capacity, likelihood or tendency to deceive or confuse the public" here.

C. *Howard and Goldman*

If we were writing on a clean slate, we might end this opinion here. But there are two federal district court decisions which reached the opposite result. We now explain why we respectfully decline to follow their lead.

These two cases have dealt with the discrepancy between the One A Day brand of vitamin-enhanced gummies and the need to consume *two* gummies a day to get one's "one a day." Both thought Bayer was entitled to win at the pleading stage. The *Howard* court framed its rationale this way: "A reasonable consumer of any medicine or medicine-like substance such as vitamins would not stop with the brand name. He or she would read the label for the dosage." (*Howard, supra*, 2011 U.S. Dist. 161583 at p. 2.)

The *Goldman* court said substantially the same thing: "Here, it is implausible that a reasonable consumer would look at only the front portion of a label that wraps around a round container of multivitamins, and conclude from the

20

combination of 'One A Day®' (a 70-year-old brand name) and the statement '70 Gummies' that the bottle contains 70 days' worth of multivitamins. Consumers buy multivitamins precisely to obtain an aggregate amount of vitamins, and it is implausible that a purchaser would not look at the label to see what vitamins are included and in what quantity. A reasonable consumer would not purchase multivitamins before determining what vitamins were in the formulation, and that information is clearly listed on the remainder of the One A Day® VitaCraves® label, along with the information that the serving size is '2 gummies' and the number of 'Servings per Container' is 35." (*Goldman, supra*, 2017 U.S. Dist. LEXIS 117117 at pp. 18-19.)

We could hardly disagree more.

In California (and apparently in Arkansas as well[14]) product mislabeling claims are generally evaluated using a "reasonable consumer" standard, as distinct from an "unwary consumer" or a "suspicious consumer" standard. We respectfully part company with *Howard* and *Goldman* because both cases rest on the assumption that reasonable consumers of vitamins are back-label scrutinizers. We think that assumption untenable. It may well be that many people – including some judges and lawyers – would make such an inquiry. It may well be that engineers and scientists and the vitamin cognoscenti would make such an inquiry. But we are convinced other consumers – knowing they have very little scientific background – would rely upon the representation of a known brand with 70 years of goodwill and credibility behind it. We think it likely they would consider that known brand – presumed to be the employer of doctors, biologists, and pharmacologists – to be a better judge of what vitamins and minerals should be taken than they are.

---

14    The *Howard* court observed that while the reasonable consumer standard was "not a settled point of Arkansas law," the Arkansas Supreme Court would probably adopt such a standard. (*Howard, supra*, 2011 U.S. Dist. LEXIS 161583 at p. 1.)

21

It is safe to say the market for vitamins is large and varied.[15]  And reasonable consumers within that market will represent many different approaches to vitamin purchases.  One of the most instructive cases on the diverse nature of vitamin consumers is *National Nutritional I, supra,* a 1974 case where the Second Circuit Court of Appeal explicitly distinguished between sophisticated consumers and ordinary consumers for purposes of FDA regulations of vitamin and supplement labels.  We concur with that court's observation that, "Petitioners argue also that it is unreasonable to prevent a purchaser from obtaining any combination he may desire by restricting him to the FDA's list of all vitamins and minerals, all vitamins, all minerals, or all vitamins and iron.  So far as concerns the sophisticated purchaser this may well be so.  But the FDA was entitled to give thought to the ordinary consumer, who may be harmed, for example, by purchasing a less inclusive combination while believing that he is getting everything he needs."

The distinction was later underscored by the same federal court in *National Nutritional Foods Assoc. v. Mathews* (2d Cir. 1977) 557 F.2d 325 (*National Nutritional II*).  *National Nutritional II* directly considered regulations promulgated by the FDA in the early 1970's which would have made a prescription necessary to obtain a preparation of vitamin A over 10,000 international units, or vitamin D over 400 international units.  Vitamin producers took the FDA to court.  In striking down the regulations, the appellate court noted that the many people might be content with the then-FDA recommended daily allowances, but some sought more vitamins "to maintain optimal health" than the

---

15     As expressed by one commentator:  "A routine trip through the health section of a local retail store can be a pretty overwhelming experience.  The wide variety of vitamins, minerals, herbs, and athletic performance products makes selecting a dietary supplement quite difficult.  To put this difficulty into perspective, consider that Wal-Mart currently sells over 500 different dietary supplements, and specialty stores like GNC sell significantly more.  Dietary supplements vary widely, and even common multivitamins now target specific groups of people by age, gender, physical conditions, and also activity level." (Richard E. Nowak, *DSHEA'S Failure: Why A Proactive Approach to Dietary Supplement Regulation Is Needed to Effectively Protect Consumers* (2010) 2010 U. Ill. L.Rev. 1045, 1046, fns. omitted.)

FDA maximums.  (*Id.* at p. 336.)  The vitamin producers won the battle in a decision holding the proposed regulations were indeed arbitrary and capricious.  (*Id.* at p. 337.)

The *National Nutritional* cases each recognize what should be common sense in any event, namely that the market among reasonable consumers of vitamins is not monolithic.  Not every vitamin-buyer is a health-conscious consumer preoccupied with exact dosages.  Some are people with only a vague sense that they "need vitamins." Others fully understand what they perceive to be a need, but choose to trust a time-tested provider.  Reasonable consumers will vary.  Bayer itself targets a variety of submarkets among vitamin consumers.  (See *Gallagher v. Bayer AG* (N.D. Cal. 2015) 2015 U.S. Dist. LEXIS 109807, p. 2 (*Gallagher*) ["Plaintiffs contend that Bayer 'sell[s] many varieties of Supplements targeted at different segments of the population based on age, gender, and even health concerns'"]; see also *Johns v. Bayer Corp.* (S.D. Cal. 2010) 2010 U.S. Dist. LEXIS 62804 [claim that two Bayer products targeted for men did nothing to reduce risk of prostate cancer].)

So we cannot declare at the pleading stage that *all* reasonable consumers of vitamins are the label-scrutinizers the *Howard* and *Goldman* courts assume, if only because of the role the idea of an "RDA" or "recommended daily allowance" plays in vitamin purchases.  The idea of the RDA for specific nutrients was developed about 1941, from a study conducted by a private organization, the National Academy of Sciences, with a view toward nutritional issues that could affect national defense.[16]  The

---

[16]    See Kelli K. Garcia, *The Fat Fight: The Risks and Consequences of the Federal Government's Failing Public Health Campaign* (2007) 112 Penn St. L. Rev. 529, 559: "In 1940, as the United States involvement [in] World War II approached, the National Academy of Sciences created a committee to advise the federal government regarding nutrition issues that might affect national defenses.  In May 1941, the committee issued the first Recommended Dietary Allowances (RDAs).  The committee produced revisions in 1943, and similar committees continue to revise the RDAs every five to ten years."  (Fns. omitted.)

RDAs have been periodically updated since.[17]  Regulations were promulgated in 1941 mandating RDA labeling of vitamin content.[18]

The very idea of One A Day, as both *National Nutritional I* and *II* intimated, is that most ordinary consumers can obtain their RDA with one simple unit. We think it clear that the One A Day brand of capsules was developed in the aftermath of World War II to take advantage of that idea of simplicity and completeness, and grew into the "70-year-old brand name" (*Goldman's* phrase) we deal with today.

Moreover, it also seems safe to say that Bayer does not target its vitamin-enhanced gummies toward the sort of consumer who treats vitamins as – to use *Howard's* phrase – "medicine" or "medicine-like," substances.[19]  Rather, judging from the ingredient list, Bayer's gummies are targeted at more casual consumers.[20]

Finally we must go back to the packaging before us.  There is nothing on the front of the bottle of gummies to suggest *anything other* than that one gummie supplies a sufficient amount of vitamins to cover a person's RDA.  The front does not say anything like, for example: "One A Day *Brand* Gummies:  Get your classic one a day by

---

[17]     See *Herbert v. National Academy of Sciences* (D.C. Cir. 1992) 974 F.2d 192, 193.

[18]     See Lewis A. Grossman, *Food, Drugs, and Droods: A Historical Consideration of Definitions and Categories in American Food and Drug Law* (2008) 93 Cornell L.Rev. 1091, 1123, footnote 225, citing inter alia, Regulations for the Enforcement of the Federal Food, Drug, and Cosmetic Act, 6 Fed. Reg. 5921, 5921 (Nov. 22, 1941) (codified at 21 C.F.R. pt. 2.10a).

[19]     The "medicine" or "medicine-like" model appears to run counter to *National Nutritional I* which rejected the idea of requiring prescriptions for mega-doses of vitamins A and D on the theory that at high levels those vitamins have a "therapeutic" as distinct from "nutritional" value.  *Nutrilab, Inc. v. Schweiker* (7th Cir. 1983) 713 F.2d 335 (*Nutrilab*) provides this nice summary of that (very long) opinion:  "In [*National Nutritional I*], the FDA attempted to regulate as drugs all vitamin and mineral products in excess of the upper limits of the U.S. Recommended Daily Allowances ('RDA').  To bring these products within the Section 321(g)(1)(B) drug definition, the FDA had to show that the manufacturer's intended use was for treatment of a disease.  Because the hearing record disclosed no food or nutrition use of nutrients at such high levels, the FDA inferred that the products were intended for therapeutic use.  The court found first, that a significant number of persons have indisputable nutritional need for potencies exceeding the upper limits; and second, that to find actual therapeutic intent under part B of Section 321(g)(1) requires something more than evidence of uselessness as a food for most people.  504 F.2d at 789." (*Nutrilab, supra*, 713 F.2d at p. 338.)

[20]     Not only are two different kinds of sugars (glucose syrup and sucrose) listed as the most prominent ingredients, but each gummie – depending upon flavor – contains one of three kinds of artificial dye. That is not the sort of ingredient list that is likely to appeal to skeptical consumers scrutinizing labels in a health food market.  These are mass-market products.  They're gummies, for crying out loud.

chewing just two gummies."[21]  To find out about the need to chew two, one must literally turn to the fine print on the back side of the bottle, which not only doesn't *confirm* the expectations from the front, but in fact *contradicts* them.  The court in *Williams* said that sort of front-back contradiction was sufficiently misleading to preclude disposition at the pleading stage of the litigation, and we agree.

D.  *Breach of Warranty Claim*

Brady's warranty claim is predicated on section 2313 of the Commercial Code, quoted in full in the margin.[22]  The key language of the statute pertains to "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  Based on what we have already said about the front of the One A Day bottle in this case, Brady has stated at least a prima facie case for a valid claim of breach of warranty:  The front of the bottle makes an implied affirmation that one gummie will be sufficient for one day's vitamins.  When combined with the assurance the bottle contains 100 gummies, there is a promise of quantity:  A 100-day supply.[23]

Bayer's argument is that any seeming warranty representations on the front can be (we quote from the respondent's brief) "contradicted by specific language on the same label."  For this proposition, Bayer cites section 10215 of the Commercial Code,

---

[21]  We will not assume that the illegible little dot off to the bottom of "One A Day" on the label – the "®" – is sufficient, as a matter of law, to warn consumers that "One A Day" is *only* a brand name and conveys no descriptive content.  Even sophisticated consumers who might recognize the trademark symbol as indicating a brand name *qua* brand name still might take the brand name as indicating a promise about the product's content.  After all, that happened in the case of "Jason and Avalon Organics" in the *Brown Organic* case.

[22]  "(1) Express warranties by the seller are created as follows:  [¶]  (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.  [¶]  (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.  [¶]  (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.  [¶]  (2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

[23]  Apparently the bottle at issue in *Goldman* was smaller – only 70 gummies.

again quoted in full in the margin.[24] Presumably Bayer is relying on the language that "Exact or technical specifications displace an inconsistent sample or model or general language of description."

As far as we can tell, no published California opinion has construed section 10215 of the Commercial Code, and we think Bayer's interpretation to be a Kierkegaardian leap of advocacy. On its face Commercial Code section 10215 contemplates a situation where there are *two or more* warranties proffered, as distinct from a situation where there is one warranty on the front negated by a disclaimer on the back. The point of the statute is to set up a methodology of reconciliation; the statute incorporates the venerable principle of contract interpretation that specific language controls general language. (Civ. Code, § 3534.) That isn't the case here, where the front of the label impliedly warrants enough gummies to last 100 days, but the back whittles that figure down to 50. We endorse the language from *Novartis* about necessary implications from a brand name. (See *Novartis, supra,* 290 F.3d at pp. 586-587 [a false message can be "conveyed by necessary implication"].)

Bayer's interpretation, in fact, contradicts what *Dorman v. International Harvester Co.* (1975) 46 Cal.App.3d 11 (*Dorman*) said about another section in the Commercial Code, section 2316, which involves the exclusion or modification of warranties. Employing the irresistible Job's lament allusion, the *Dorman* court said: "In other words, section 2316 seeks to protect the buyer from the situation where the

---

[24] "Warranties, whether express or implied, must be construed as consistent with each other and as cumulative, but if that construction is unreasonable, the intention of the parties determines which warranty is dominant. In ascertaining that intention the following rules apply: [¶] (1) Exact or technical specifications displace an inconsistent sample or model or general language of description. [¶] (2) A sample from an existing bulk displaces inconsistent general language of description. [¶] (3) Express warranties displace inconsistent implied warranties other than an implied warranty of fitness for a particular purpose."

salesman's 'pitch,' advertising brochures, or *large print in the contract*, *giveth*, and the *disclaimer clause – in fine print – taketh away*." (*Id.* at p. 18, italics added.)[25]

We quote section 2316 of the Commercial Code in the margin as well.[26] We emphasize this language: "to exclude or modify any implied warranty of fitness the exclusion must be by a writing *and conspicuous*." (Italics added.)

In the case before us, the front of the bottle implies a warranty that its contents are fit to last 100 days. Under Commercial Code section 2316 and *Dorman*, any disclaimer had to be conspicuous. We don't think that the microscopic "**Chew**: Two Gummies daily" and "Serving Size: 2 gummies" on the back is sufficiently conspicuous to modify the implied warranty on the front. And we doubt that readers who peruse our reproductions on page 4 of our slip opinion will think so either. The "ONE A DAY" text

---

[25] Bayer also quotes this passage from *McKinniss v. General Mills, Inc.* (2007) 2007 U.S. Dist. LEXIS 96107, as additional authority to support its warranty argument: "Defendant truthfully disclosed the ingredients in each of these five products . . . but plaintiffs chose not to read them. Plaintiffs' selective reading or alleged misunderstanding cannot give rise to an express warranty claim." (*Id.* at p. 19.)

True enough – the fine print on the side disclosed the true contents of the box – but irrelevant for this case. In *McKinniss* it was *unreasonable* as a matter of law to believe, based on the front of the box, that the cereal contained actual fruit in the first place: "Plaintiffs' allegation that the cereal pieces themselves resemble fruit is not rational, let alone reasonable. The cereal pieces are brightly colored rings, which in no way resemble any currently known fruit. As a matter of law, no reasonable consumer would view them as depicting any fruit." (*McKinnis, supra*, 2007 U.S. Dist. LEXIS 96106 at pp. 11-12.) *McKinniss* is not a case where the front reasonably promised something, say "This cereal contains real fruit" and then the side said something like, "well, by 'fruit' we mean something that once came from a fruit tree in some manner, shape or form."

[26] "(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this division on parol or extrinsic evidence (Section 2202) negation or limitation is inoperative to the extent that such construction is unreasonable. [¶] (2) Subject to subdivision (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, *and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.* Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' [¶] (3) Notwithstanding subdivision (2) (a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and [¶] (b) When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and [¶] (c) An implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade. [¶] (4) Remedies for breach of warranty can be limited in accordance with the provisions of this division on liquidation or limitation of damages and on contractual modification of remedy (Sections 2718 and 2719)." (Italics added.)

on the front label is orders of magnitude larger than the fine print "two gummies" text on the back label.  We think we must reverse as to Brady's warranty claim as well.

## III.  DISPOSITION

The judgment is reversed.  Appellant shall recover his costs on appeal.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.