**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TAMARA MOORE; GRETA L. ERVIN; RAFF ARANDO; NICHOLS SMITH; RENEE EDGREN; CYNTHIA WELTON, on behalf of themselves and all others similarly situated, *Plaintiffs-Appellants*, | No. 18-15026 D.C. No. 3:16-cv-07001-MMC |
| v. | OPINION |
| MARS PETCARE US, INC.; NESTLE PURINA PETCARE COMPANY; HILL'S PET NUTRITION, INC.; PETSMART, INC.; MEDICAL MANAGEMENT INTERNATIONAL, INC., DBA Banfield Pet Hospital; BLUEPEARL VET, LLC; ROYAL CANIN USA INC., *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted July 19, 2019
San Francisco, California

Filed July 28, 2020

Before:  Michael R. Murphy,[*] Richard A. Paez, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Rawlinson

**SUMMARY**[**]

**Consumer Protection Law**

The panel reversed the district court's dismissal of claims that defendants' marketing of so-called prescription pet food violated California's consumer protection laws and remanded for further proceedings.

In their putative class action lawsuit, plaintiffs alleged that the prescription requirement and advertising of pet food led reasonable consumers falsely to believe that such food had been subject to government inspection and oversight and had medicinal and drug properties, causing consumers to pay more or purchase the product when they otherwise would not have.

The panel held that the district court erred in dismissing claims under California's Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act for

---

[*] The Honorable Michael R. Murphy, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

failure to state a claim. The panel concluded that under the reasonable consumer test, plaintiffs sufficiently alleged that the sale of the prescription pet food exclusively through vets or with veterinarian approval was a deceptive practice. In addition, plaintiffs satisfied the heightened pleading standard for fraud because they alleged sufficient facts to show that prescription pet food and other pet food were not materially different. Further, plaintiffs adequately alleged reliance because they sufficiently alleged that the use of the word "prescription" or "Rx" symbol caused their claimed loss.

In a separately filed memorandum disposition, the panel affirmed the district court's dismissal of a federal antitrust claim.

Dissenting, Judge Rawlinson wrote that plaintiffs did not state a plausible claim for relief under the California statutes. She concluded that the majority relied incorrectly on defendants' lack of compliance with a Draft Compliance Policy Guide issued by the United States Food and Drug Administration, and plaintiffs failed sufficiently to elucidate the basis for the "reasonable assumption" that the pet food had been vetted and approved by the FDA. Judge Rawlinson also wrote that plaintiffs' claim under California's CLRA was preempted by the federal Food, Drug and Cosmetic Act.

## COUNSEL

Michael von Loewenfeldt (argued), Kerr & Wagstaffe LLP, San Francisco, California; Daniel R. Shulman, Gray Plant Mooty Mooty & Bennett P.A., Minneapolis, Minnesota; Michael A. Kelly and Matthew D. Davis, Walkup Melodia Kelly & Schoenberger, San Francisco, California; Michael

L. McGlamry and Wade H. Tomlinson III, Pope McGlamry P.C., Atlanta, Georgia; Edward J. Coyne III, Ward and Smith P.A., Wilmington, North Carolina; for Plaintiffs-Appellants.

Jonathan D. Hacker (argued), Richard B. Goetz, Michael Tubach, and Hannah Y. Chanoine, O'Melveny & Myers LLP, Los Angeles, California; John E. Schmidtlein (argued), Benjamin M. Greenblum, and Xiao Wang, Williams & Connolly LLP, Washington, D.C.; Jeffrey E. Faucette, Skaggs Faucette LLP, San Francisco, California; Bryan A. Merryman and Christopher M. Curran, White & Case LLP, Los Angeles, California; for Defendants-Appellees.

## OPINION

PAEZ, Circuit Judge:

This appeal arises out of a challenge by Tamara Moore and five other California residents (collectively "Plaintiffs") to the marketing of so-called prescription pet food under California's consumer protection laws and federal antitrust law.[1]  Plaintiffs brought a putative class action lawsuit against four pet food manufacturers, two veterinary clinic chains, and one pet goods retailer (collectively "Defendants").  Plaintiffs allege that the prescription requirement and advertising lead reasonable consumers falsely to believe that such food has been subject to government inspection and oversight, and has medicinal and

---

[1] Defendants use other terms like "therapeutic pet food" and "veterinarian recommended" to describe this kind of food, but for consistency with Plaintiffs' second amended complaint, we use the term "prescription pet food."

drug properties, causing consumers to pay more or purchase the product when they otherwise would not have. The district court granted Defendants' motions to dismiss Plaintiffs' Second Amended Complaint. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.[2]

## I.

### A.

The following facts are taken from Plaintiffs' allegations in the Second Amended Complaint, the operative complaint, "[b]ecause the district court dismissed the complaint on the pleadings." *Reid v. Johnson & Johnson*, 780 F.3d 952, 956 n.1 (9th Cir. 2015) (citation omitted).

*Defendants*

Defendants consist of pet food manufacturers, Mars Petcare US, Inc. and Royal Canin U.S.A., Inc. (collectively "Mars"),[3] Nestle Purina Petcare Company ("Purina"), and Hill's Pet Nutrition, Inc. ("Hill's"); veterinary clinic chains, Medical Management International, Inc. d/b/a Banfield Pet Hospital ("Banfield") and BluePearl Vet, LLC ("Blue Pearl"); and pet goods retailer, PetSmart, Inc. ("PetSmart"). Hill's manufactures and markets its prescription pet food in

---

[2] In a separately filed memorandum disposition, we affirm the district court's dismissal of Plaintiffs' claim that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

[3] We use "Mars" to describe Mars and Royal Canin collectively because Royal Canin is a subsidiary affiliate of Mars, and Plaintiffs allege that "[s]ome combination of Royal Canin and Mars manufacturers, produces, [and] markets . . . Royal Canin 'Veterinary Diet,'" one of the products at issue.

packaging labeled "Prescription Diet." Purina manufactures and markets its prescription pet food under the label "Pro Plan Veterinary Diets." Mars manufactured and sold prescription pet food under the "Iams" label prior to January 1, 2017 and switched to "Royal Canin Veterinary Diet" starting in 2017.

The market for prescription pet food had a slow roll-out. Hill's began selling its "Prescription Diet" pet food in the 1960s through vets and, in the late 1980s, began supplying vets with prescription pads as part of its marketing effort. In 2004, when Hill's became a significant player in the prescription pet food market, Mars introduced its own line of prescription pet food. At an unspecified time prior to 2012, Purina entered the prescription pet food market. Mars, Purina and Hill's (collectively "Defendant Manufacturers") have over 90 percent share of the U.S. prescription pet food market.

Three small companies attempt to compete with Defendant Manufacturers: Blue Buffalo Company, Diamond Pet Foods, and Darwin's Natural Pet Products. Mars—which has 100 percent ownership over Banfield and 90 percent over Blue Pearl—has a strategic partnership with PetSmart that involves hosting Banfield hospitals in PetSmart store locations throughout the United States. Banfield and PetSmart sell prescription pet food made by Defendant Manufacturers, but not any other competitors.

PetSmart sells Defendant Manufacturers' prescription pet food online and in its brick-and-mortar stores, requiring proof of a prescription from the pet's vet. At PetSmart stores, a consumer must first obtain an Rx card from Banfield, either by visiting a Banfield veterinarian (hereinafter, "vet") on site or presenting a prescription from another vet to Banfield. Consumers may also purchase

Defendant Manufacturers' prescription pet food directly from Banfield or Blue Pearl. PetSmart, Bluefield and Blue Pearl are not the exclusive sources of Defendant Manufacturers' prescription pet food, but there is no dispute that all Defendants require a vet prescription as a condition for the purchase of prescription pet food.

In September 2012, the U.S. Food & Drug Administration ("FDA") published for comment a Draft Compliance Policy Guide ("Draft CPG"). In the Draft CPG, the FDA noted that there has been an increase in the number of pet food products labeled as intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease, as well as a shift in marketing toward pet owners directly. The agency expressed concerns that animal health may suffer from consumption of these products because they "affect physiological processes to extents that may not be tolerated by all animals and/or may not achieve effective treatment." The FDA was, however, "less concerned when such dog and cat food products are marketed only through and used under the direction of a licensed veterinarian because the agency presume[d] the veterinarian will provide direction to the pet owner." The FDA then proposed a set of nine factors it would consider in determining whether to initiate enforcement action against pet food products.

At that time, in late-2012, Defendant Manufacturers' products violated three of the factors in the Draft CPG. First, their prescription pet food included indications of disease claims on the labels. Second, the distribution of promotional materials with disease claims were not limited to veterinary professionals. Third, they electronically disseminated promotional materials with disease claims to consumers on the internet. The FDA adopted a final Compliance Policy

Guide[4] ("Final CPG") in April 2016, in substantially the same form as the Draft CPG, although it added two more conditions that could lead to enforcement action. Defendant Manufacturers did not change their behavior despite violating the same three conditions of the Final CPG. The FDA has not, however, taken any enforcement action against Defendant Manufacturers.

### *Plaintiffs*

Plaintiffs are six California residents who purchased prescription pet food for their sick pets after consulting with their vets.

For instance, Plaintiff Moore alleges she purchased "Hill's Prescription Diet u/d dog food" after her dog, Pugalicious, underwent surgery to remove kidney stones. Pugalicious's vet informed Moore that a prescription was required to purchase the dog food, and he issued her one. Moore initially tried to purchase the product from an animal hospital but was refused because she failed to present a prescription. She subsequently was able to purchase the prescription pet food at a PetSmart using a prescription. The product is marketed to provide for "Urinary Care," and claims that it "[p]romotes desirable urine pH," is "especially formulated to help support your dog's bladder health . . . [and] [e]nriched with taurine, L-carnitine & antioxidants," and has "[c]ontrolled levels of high quality, highly digestible protein." The product costs $3.44 per pound while urinary care non-prescription dog foods from other manufacturers cost $2.73 and $2.45 per pound. The non-prescription dog food was also marketed to "[p]romote[] balanced urinary pH" and "a healthier immune system [and] urinary tract,"

---

[4] The Final CPG is published at 81 Fed.Reg. 26,236–01.

and had "a number of overlapping ingredients in common" with Hill's prescription dog food, while the "non-overlapping ingredients are not drugs and are not sufficient to justify one product being sold by prescription for a significantly higher price."

The other five plaintiffs made similar allegations. Plaintiff Greta Ervin's dog, Teddy, became ill from giardia, after which she received a prescription from Teddy's vet for Royal Canin Veterinary Diet Gastrointestinal Puppy dog food, as well as a prescription from a specialty vet for Royal Canin Veterinary Diet Selected Protein Adult PV dog food. Ervin "understood a prescription requirement to indicate that the foods contained medicine and were subject to the controls associated with prescription drugs." The ingredients of the prescription dog food overlapped significantly with the ingredients of non-prescription dog food that was also marketed for digestive health and sensitive digestion, although the price of the prescription pet food was two to three times that of the non-prescription counterparts; none of the non-overlapping ingredients consisted of drugs.

Plaintiff Nicols Smith had two cats, Mimi and Neichi, who became overweight, and he received a prescription for Hill's "Prescription Diet Glucose/Weight Management m/d cat food" from their vet. When the vet told Smith that a prescription was required, Smith "assumed and understood that there was something medicinal in the food, a medically controlled substance containing a drug." Because the product was substantially more expensive than the non-prescription cat food he had been buying, Smith first attempted to purchase the Hill's prescription cat food at a Petco without a prescription. He was turned away and advised he could not buy the product without presenting a

prescription from a vet. Hill's prescription cat food was marketed to help support a cat's glucose and weight management, and its ingredients overlapped over 65 percent of those of Hill's non-prescription diet cat food. Again, the non-overlapping ingredients did not include drugs and did not justify tripling the cost of the prescription cat food.

Plaintiffs assumed from the prescription requirement that this pet food was "(a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the . . . [FDA] as a drug; (d) a substance to which the manufacturers' representations regarding intended uses and effects have been evaluated by the FDA; and (e) a substance legally required to be sold by prescription." As a result, Plaintiffs paid more for the prescription pet food than they would have in the absence of the prescription requirement, had they purchased it at all.

## B.

Plaintiffs filed their Second Amended Complaint in August 2017 after the district court granted, with leave to amend, Defendants' initial motions to dismiss Plaintiffs' First Amended Complaint.

Plaintiffs alleged, among other matters, claims for relief that Mars and Hill's violated three California state consumer protection laws:[5] California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; California's False Advertising Law ("FAL"), Cal. Bus. &

---

[5] Four of the six Plaintiffs purchased Hill's prescription pet food while the other two purchased Mars prescription pet food. Thus, Purina is not named as a defendant on these California state law counts.

Prof. Code § 17500, et seq.; and California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq. Plaintiffs also sought class certification, injunctive relief, and damages.

Defendants filed motions to dismiss the Second Amended Complaint for failure to state a claim for relief under the California consumer protection laws, failure to plead those claims with sufficient particularity under Federal Rule of Civil Procedure 9(b), and for lack of standing.[6] The district court granted the motions with leave to amend the California state law claims to specify how the term prescription or Rx symbol affected each plaintiff's decision to purchase such pet food. Plaintiffs elected to rest on the allegations in the Second Amended Complaint, and the district court dismissed the case with prejudice. Plaintiffs timely appealed.

## II.

We review de novo the district court's dismissal of a complaint under Rules 9(b) and 12(b)(6). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003). All allegations of material fact in the complaint are taken as true and construed in the light most favorable to Plaintiffs. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937 (9th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[6] As noted above, Defendants also moved to dismiss the Sherman Act antitrust claim, which the court granted. *See* note 1, *supra*.

"As a federal court sitting in diversity [over Plaintiffs' California state law claims], we must apply the substantive law of California, as interpreted by the California Supreme Court." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1103 (9th Cir. 2013) (quotations omitted).

## III.

Plaintiffs argue that the district court erred by dismissing their California state law consumer protection claims against Defendants Mars and Hill's. As discussed below, we agree that the district court erred in dismissing the California claims.

California's UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. California's FAL prohibits any "unfair, deceptive, untrue or misleading advertising." *Williams*, 552 F.3d at 938 (quoting Cal. Bus. & Prof. Code § 17500). "'Any violation of the [FAL] . . . necessarily violates' the [UCL]." *Id.* (original alterations omitted) (quoting *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002)). Last, California's CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770. Among the twenty-four activities deemed unlawful within the CLRA, two are relevant to this case: "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services" and "[r]epresenting that goods . . . have . . . approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." *Id*. §§ 1770(a)(2), (5).

The gravamen of Plaintiffs' claim is that Hill's and Mars violated the UCL, FAL, and CLRA through their false and

misleading advertising of prescription pet food.[7] Specifically, through the prescription requirement, their advertising and marketing statements, and failure to include an adequate disclaimer, Mars and Hill's allegedly misrepresented that the prescription pet food: (1) qualified as some sort of drug or medicine; (2) met a medical requirement for the pet; (3) had been evaluated by the FDA as a drug; (4) had been evaluated by the FDA regarding its intended uses and effects; (5) required a prescription per federal or state law; and (6) warranted a particular premium price.

The district court dismissed Plaintiffs' California state law claims on three separate grounds: first, the court concluded that the sale of the prescription pet food exclusively through vets or with veterinarian approval was not itself a deceptive or otherwise misleading practice; second, the court concluded that plaintiffs failed to plead enough facts to show that prescription pet food and other pet food are not materially different; third, the court determined that Plaintiffs failed adequately to allege that the use of the word "prescription" or "Rx" symbol to have caused any of their claimed loss. We disagree with all three grounds.

## A. Deceptive or Misleading Practice

Whether a business practice is deceptive or misleading "under these California statutes [is] governed by the 'reasonable consumer' test." *Williams*, 552 F.3d at 938 (quoting *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.

---

[7] Because the cause of action under each California state law is premised on the same allegedly misleading acts in this case—i.e., misrepresentation of the certification of and ingredients in prescription pet food—we evaluate the UCL, FAL, and CLRA claims collectively, as did the district court and all parties.

1995)).  Plaintiffs "must show that members of the public are likely to be deceived."  *Id.* (quotations omitted).  This "requires more than a mere possibility that [Defendants'] label 'might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner.'"  *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (quoting *Lavie v. Proctor & Gamble Co.*, 129 Cal. Rptr. 2d 486, 495 (Ct. App. 2003)).   "Rather, the reasonable consumer standard requires a probability 'that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" *Id.* (quoting *Lavie*, 129 Cal. Rptr. 2d at 495).

California laws "prohibit 'not only advertising which is false, but also advertising which[,] *although true*, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"  *Williams*, 552 F.3d at 938 (emphasis added) (quoting *Kasky*, 45 P.3d at 951).  "[W]hether a practice is deceptive will usually be a question of fact not appropriate for decision on demurrer" or motions to dismiss.  *Id.* (citing *Linear Tech. Corp. v. Applied Materials, Inc.*, 61 Cal. Rptr. 3d 221, 236–37 (Ct. App. 2007)).  Several themes emerge from cases evaluating the potential to mislead under the reasonable consumer test.

First, "[l]iteral truth can sometimes protect a product manufacturer from a misleading claim, but it is no guarantee," whereas "there is no protection for literal falseness."  *Brady v. Bayer Corp.*, 237 Cal. Rptr. 3d 683, 691–92 (Ct. App. 2018).  For instance, in *Kwikset Corp. v. Super. Ct.*, the California Supreme Court reversed dismissal of a UCL claim challenging defendants' practice of selling locks with "Made in U.S.A." labels when some screws and pins in the assembly were made in Taiwan.  246 P.3d 877, 882, 890–91 (Cal. 2011).

Second, qualifiers in packaging, usually on the back of a label or in ingredient lists, "can ameliorate any tendency of the label to mislead." *Brady*, 237 Cal. Rptr. 3d at 692. If, however, "a back label ingredients list . . . conflict[s] with, rather than confirm[s], a front label claim," the plaintiff's claim is not defeated. *Id.* at 693. For instance, in *Williams*, we held that a reasonable consumer would be misled where packaging on defendant's snacks stated "fruit juice" next to images of fruit when in fact fruit juice was not a listed ingredient. 552 F.3d at 939–40. Conversely, in *Ebner*, we held that a reasonable consumer would not be misled about the amount of lip balm in a tube because it was undisputed that the label disclosed the correct weight of included lip product. 838 F.3d at 965–66; *see also Freeman*, 68 F.3d at 289–90 (holding that promotional mailers for sweepstakes were not likely to deceive reasonable consumers because the mailers themselves contained qualifying language).

Third, "brand names *by themselves* can be misleading in the context of the product being marketed." *Brady*, 237 Cal. Rptr. 3d at 694. Descriptive brand names require of the consumer "little thought," which can make consumers susceptible to purchasing because "*they won't have the time or interest to read about [the product] on [the] website or the back of the box.*" *Id.* (quoting the California Attorney General's amicus brief). Thus, a product called "One a Day" gummy vitamins, which required two gummies a day for a full dosage, is explicitly misleading. *Id.* at 696–97. Conversely, if common sense would not lead anyone to be misled, then the claim may be disposed of at a motion to dismiss stage. *Id.* at 690–91.

Under these guidelines, the labeling of "prescription pet food" does appear deceptive and misleading. Common sense dictates that a product that requires a prescription may

be considered a medicine that involves a drug or controlled substance. *See, e.g.*, Prescription, Merriam-Webster, https://www.merriam-webster.com/dictionary/prescription (last accessed August 2, 2019) (defining "prescription" as, among other things, "a prescribed medicine"). This conforms to general understandings of prescription drugs for humans and pets. Moreover, the brand name of "prescription pet food" itself could be misleading. A reasonable consumer being told about "prescription pet food" may be surprised to learn that there are no drugs or controlled ingredient in the pet food by nature of brand names like "Prescription Diet" or an "Rx" symbol on the food packaging. *See Williams*, 552 F.3d at 939 ("The product is called 'fruit juice snacks' and the packaging pictures a number of different fruits, potentially suggesting (falsely) that those fruits or their juices are contained in the product.").

The district court seems to have discounted the potential to mislead in part because vets play a role in the referral process. This reasoning, however, is misguided. The reasonable consumer test requires looking at "the general consuming public or targeted consumers."[8] *Ebner*, 838 F.3d at 965 (quoting *Lavie*, 129 Cal. Rptr. at 495). Plaintiffs allege, and Defendants do not seem to deny, that Defendant Manufacturers' prescription pet food is marketed to consumers, in addition to vets. In fact, all parties agree that there has been a historic shift from this kind of pet food being

[8] Defendants' argument—that the individual Plaintiffs lacked exposure to the term "prescription pet food" prior to receiving a written prescription from their vets—impacts the standing analysis, but *not* the reasonable consumer analysis. *See Reid*, 780 F.3d at 958 ("[T]he reasonable consumer standard, unlike the individual reliance requirement[,] . . . is not a standing requirement."). We analyze standing separately. *See infra* at 20–23.

distributed only through vets to being sold directly to consumers. Thus, to whatever extent that the district court assumed that *vets* could tell the difference between food and medicine, that reasoning is insufficient under the reasonable *consumer* test.

Moreover, even though the FDA, in the 2016 CPG, explicitly sanctions the role of vets in supervising consumption of this type of pet food, that does not automatically defeat Plaintiffs' claim. The Seventh Circuit recently addressed the marketing of prescription cat food by Hill's and PetSmart and held that the plaintiffs' complaint adequately pled a deceptive-practices claim under an Illinois consumer protection statute.[9]  *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739 (7th Cir. 2019).  In analyzing the same CPG, the Seventh Circuit concluded that it "doesn't signal [the FDA's] authorization" and "doesn't specifically authorize the [defendant]'s prescription requirement, prescription label, and related marketing representations."  *Id*. at 738.  We agree with the Seventh Circuit's reading of the 2016 CPG.

We also find it persuasive that the FDA warns in the CPG that the labeling on such pet food "may lack sufficient information, particularly for pet owners."  Plaintiffs allege that Defendant Manufacturers violate three of the conditions listed in the CPG, which make it more likely that the FDA would consider enforcement action.  Even assuming the FDA does not expressly prohibit the "prescription"

---

[9] The Illinois law "protect[s] consumers . . . against fraud, unfair methods of competition, and other unfair and deceptive practices." *Vanzant*, 934 F.3d at 736 (quotations omitted).  The California UCL targets deceptive, unfair and unlawful business practices, *see* Cal. Bus. & Prof. Code § 17200, so it is broader but also encompasses acts targeted by the Illinois statute.

requirement as directed to consumers, an advertising practice can be deceptive without directly violating FDA regulations.[10]  *See Reid*, 780 F.3d at 957, 967; *see also Vanzant*, 934 F.3d at 738–39.  Thus, we conclude that Plaintiffs have sufficiently alleged a deceptive practice under the reasonable consumer test.

## B.  Rule 9(b) Misrepresentation

Plaintiffs' state law claims are based in part on a theory of fraud: that prescription pet food is not materially different from non-prescription pet food and therefore does not justify the higher cost.  "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  In other words, "a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson v. Kimberly–Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (quotations omitted).[11]

---

[10] Although "[c]ompliance with FDA regulations may be relevant to a preemption argument," *Williams*, 552 F.3d at 940 n.4, Defendants do not make such an argument here.

[11] Rule 9(b) requirements may not even be necessary, given that a defendant can violate the UCL, FAL, and CLRA by acting with mere negligence.  *See Williams*, 552 F.3d at 938 (applying a "reasonable consumer" test to UCL, FAL, and CLRA claims); *Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005) (rejecting arguments that plaintiffs must show intent to deceive for CLRA and UCL claims); *Khan v. Med. Bd.*, 16 Cal. Rptr. 2d 385, 392 (Ct. App. 1993) (holding that FAL "can be violated through negligence").  Thus, because "fraud is not a required element, Rule 9(b)'s heightened pleading standard [may] not apply."  *See Vanzant*, 934 F.3d at 739; *Belville v. Ford Motor Co.*, 60 F. Supp. 3d 690, 698 (S.D. W. Va. 2014) (agreeing

Here, Plaintiffs' complaint satisfies the Rule 9(b) heightened pleading standard in alleging the basic premise of "what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106 (quotations omitted). Plaintiffs described the six kinds of prescription pet food that they purchased from Mars and Hill's and how they overlap with a substantial portion of ingredients in non-prescription pet foods that were marketed to treat similar health issues. More importantly, Plaintiffs allege that all non-overlapping ingredients are not drugs and are not sufficient to justify one product being sold by prescription for a significantly higher price.

We therefore conclude that Plaintiffs have pleaded sufficient detail to put Defendants on notice as to the fraud claim. *Compare Davidson*, 889 F.3d at 964–65 (reversing dismissal under Rule 9(b) where plaintiff alleged that defendant's marketing of its wipes as "flushable" were false), *with Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126–27 (9th Cir. 2009) (affirming dismissal where plaintiff failed to allege what misleading advertisement or sales material led him to purchase defendant's vehicle). If this case had proceeded in the district court, Defendants could have submitted evidence about why the difference in ingredients mattered between those specific prescription and non-prescription pet foods to justify the price differentials. *Cf. Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995)

---

that because "most state consumer protection laws do not require the same elements of proof as common-law fraud, . . . . a state-by-state analysis" is necessary to determine whether Rule 9(b) applies); *see also* Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1297 (4th ed.) ("Some federal or state statutes may define fraud in a manner that eliminates one or more of the[] [traditional] elements of a fraud claim . . . ."). Nonetheless, Plaintiffs did not raise this argument in their briefing, so we do not decide this issue at this stage.

("Even in cases where fraud is alleged, we relax pleading requirements where the relevant facts are known only to the defendants."). The fact that Plaintiffs placed Defendants on sufficient notice to respond to the alleged fraud reflects how their allegations meet Rule 9(b).

## C. Reliance and Standing

Last, the district court faulted Plaintiffs for not providing more detail as to how each Plaintiff relied on the "prescription" label or requirement to purchase the food. Since the passage of Proposition 64,[12] a plaintiff must allege actual reliance in order to have standing to pursue UCL and FAL claims. *See Hinojos*, 718 F.3d at 1103–04; *see also* Cal. Bus. & Prof. Code §§ 17204, 17535. "[A]ny plaintiff who has standing under the UCL's and FAL's 'lost money or property' requirement will, *a fortiori*, have suffered 'any damage' for purposes of establishing CLRA standing." *Hinojos*, 718 F.3d at 1108 (citations omitted).

The test for reliance in cases premised on false advertising and misrepresentations to consumers derives from the California Supreme Court decision in *In re Tobacco II Cases*, 207 P.3d 20, 40–41 (Cal. 2009), and was reaffirmed as follows:

> [A] plaintiff "proceeding on a claim of misrepresentation . . . must demonstrate *actual reliance* on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element

---

[12] California voters passed Proposition 64 in 2004, "which restricts standing for individuals alleging UCL and FAL claims to persons who 'have suffered injury in fact . . . .'" *Hinojos*, 718 F.3d at 1103 (citing Cal. Bus. & Prof. Code §§ 17204, 17535) (brackets removed).

of reliance in ordinary fraud actions." Consequently, "a plaintiff must show that the misrepresentation was an *immediate cause* of the injury-producing conduct." However, a "plaintiff is *not* required to allege that the challenged misrepresentations were the *sole* or even the *decisive* cause of the injury-producing conduct."

*Kwikset*, 246 P.3d at 888 (emphases added) (original alterations, internal citations, and footnote omitted). "A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of [the UCL] by alleging . . . that he or she would not have bought the product but for the misrepresentation." *Id.* at 890; *see also Davidson*, 889 F.3d at 962, 966.

Plaintiffs do not provide much detail in their individual allegations, but they collectively allege that "[a]s a result of the false and fraudulent prescription requirement, each Plaintiff paid more for Prescription Pet Food than each Plaintiff would have paid in the absence of the requirement, or would never have purchased Prescription Pet Food." This is sufficient under *Kwikset* to survive a motion to dismiss. *See Hinojos*, 718 F.3d at 1105; *Williams*, 552 F.3d at 939–40. The fact that vets had prescribed each Plaintiff the pet food—rather than each discovering the pet food on their own—does not negate the allegation of actual reliance because the prescription requirement and advertising need not be the sole or even the decisive cause of the purchase. *See Kwikset*, 246 P.3d at 888.

Moreover, at the motion to dismiss stage, "actual reliance . . . is inferred from the misrepresentation of a

material fact." *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1055 (9th Cir. 2017) (quoting *Chapman v. Skype Inc.*, 162 Cal. Rptr. 3d 864, 874 (Ct. App. 2013)). Whether a misrepresentation is sufficiently material to allow for an inference of reliance is generally a question of fact that cannot be decided at the motion to dismiss stage. *See Chapman*, 162 Cal. Rptr. 3d at 874. To allege reliance, a plaintiff "only need[] establish it to be plausible that a 'reasonable man would attach importance to [the] existence or nonexistence [of the misrepresentation] in determining his choice of action in the transaction in question." *Friedman*, 855 F.3d at 1056 (quoting *In re Tobacco II Cases*, 207 P.3d at 39). Thus, in *Friedman*, we reversed dismissal of a complaint because the plaintiff alleged that a misrepresentation concerning an undisclosed fee in his insurance purchase was a material fact that allowed for an inference of actual reliance. *Id*. at 1056–57. We noted that "it is not, as a matter of law, an 'obviously unimportant' consideration for a reasonable purchaser of insurance to know [about] an undisclosed fee." *Id*. at 1056 (quoting *In re Tobacco II Cases*, 207 P.3d at 39).

Similarly, it certainly seems plausible that a reasonable consumer would at least partially rely on the prescription labeling to pay more money for a certain type of pet food over others. *Cf. Vanzant*, 934 F.3d at 739. As the California Supreme Court has emphasized, "labels matter." *Kwikset*, 246 P.3d at 889. These California laws exist to protect consumer interests in accurate label representations "because consumers rely on the accuracy of those representations in making their buying decisions." *Id*. The misrepresentation of prescription pet food as medicine or FDA-controlled can be a material fact for a reasonable consumer—particularly for a pet owner who is dealing with possibly a sick or unhealthy pet. In other words, it is

reasonable for a consumer to rely on the prescription requirement and labeling in her purchasing decision for an ailing pet.  Pets can, after all, be as cherished and cared for as family members, and a reasonable person in Plaintiffs' shoes would rationally gravitate toward a "prescription" product if that family member's health is at risk.

We therefore reverse the district court's dismissal of Plaintiffs' California state claims.[13]

---

[13] We also reject Defendants' additional arguments about the relief that Plaintiffs seek.  First, Defendants' assertion that Plaintiffs have no standing for injunctive relief is foreclosed under our recent case, *Davidson*, in which we held that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase."  889 F.3d at 969.  There is sufficient cognizable injury where Plaintiffs allege that they cannot rely on Defendants' labeling of a product when deciding whether to purchase it in the future. *Id*. at 970–71.  Second, Defendants' argument that Plaintiffs cannot seek equitable relief under the UCL or FAL, given an adequate legal remedy under the CLRA, is foreclosed by statute.  The UCL, FAL and CLRA explicitly provide that remedies under each act are cumulative to each other. *See* Cal. Bus. & Prof. Code §§ 17205, 17534.5; Cal. Civ. Code § 1752.  Last, Defendants argue that Plaintiffs do not have standing to enjoin all of Defendant Manufacturers' prescription pet food products because Plaintiffs have not purchased every single type of prescription pet food available from Hill's or Mars.  This does not constitute a basis for dismissal because Plaintiffs' challenge to prescription pet foods is to the common scheme of the prescription requirement and prescription-based advertising. *Cf. In re Tobacco II Cases*, 207 P.3d at 40–41 (holding class representatives had standing to challenge common marketing of cigarettes despite differences in the advertisements or statements on which class members relied).

**IV.**

For the reasons above, we reverse the district court's dismissal of the California state law claims and remand for further proceedings on those claims consistent with this opinion.

The parties shall bear their own costs on appeal.

**REVERSED** and **REMANDED.**

---

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent from the majority's conclusion that the district court judge erred in dismissing the putative class action complaint for failure to state a claim.

Plaintiffs' complaint asserted that Defendants violated California's Unfair Competition Law, False Advertising Law and Consumer Legal Remedies Act. Plaintiffs specifically alleged that:

> By requiring a prescription from a veterinarian as a pre-condition to the purchase of their Prescription Pet Food, Defendants misrepresent Prescription Pet Food to be: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been

evaluated by the FDA; and (e) a substance legally required to be sold by prescription.

After extensive briefing and arguments from the parties, the district court ultimately concluded that these allegations did not state a plausible claim for relief under the California statutes. The district court was not persuaded that Plaintiffs sufficiently pled that use of the word "prescription" caused any of Plaintiffs' claimed losses.

My colleagues in the majority are persuaded that Plaintiffs have pled a plausible claim for relief. They rely heavily on the Defendants' "violations" of a Draft Compliance Policy Guide published by the United States Food and Drug Administration (FDA).[1]

As an initial matter, it is of note that the Draft Policy Guide clarified from the outset that it was intended to serve only as "non-binding recommendations" for the "labeling and marketing of nutritional products intended to diagnose, cure, mitigate, treat, or prevent diseases in dogs and cats." The Draft Policy Guide explicitly provides with black-box emphasis:

> This Draft Compliance Policy Guide, when finalized, will represent the Food and Drug Administration's (FDA's) current thinking on this topic. *It does not create or confer any rights for or on any person and does not*

---

[1] Use of the term "violations" is not really accurate because, as the majority acknowledges, the FDA has never initiated any enforcement action against Defendants.

*operate to* bind FDA or the public. . . . (Emphasis added).

Notwithstanding the non-binding nature of the Draft Policy Guide, the majority opinion rests its conclusion that Plaintiffs stated a plausible claim for relief on the Defendants' "violation" of the following FDA recommendations:

5.  The product does not include indications for a disease claim (e.g. obesity, renal failure) on the label.

6.  Distribution of labeling and promotional materials with any disease claims for the product is not limited to veterinarians.

7.  Electronic resources for the dissemination of labeling information and promotional materials are not secured so that they are available only to veterinarians.

It is helpful to juxtapose the provisions in the guide to the pleading requirements of the California statutes upon which Plaintiffs' claims are predicated.

California's Unfair Competition Law prohibits use of "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

California's False Advertising Law prohibits the dissemination of "untrue or misleading" statements in advertising. Cal. Bus. & Prof. Code § 17500.

California's Consumer Legal Remedies Act prohibits a delineated number of "unfair methods of competition and

unfair or deceptive acts or practices" in connection with consumer transactions.  Cal. Civ. Code § 1770.

As discussed, Plaintiffs and the majority hinge their assertion of a plausible claim on the requirement of a veterinarian's prescription to purchase Prescription Pet Food and on Defendants' "violation" of the Policy Guide. However, assertion of plausible claims on these bases is problematic, as recognized by the district court.

The sum and substance of Plaintiffs' allegation regarding the prescription requirement is that an individual seeing the word "prescription" in connection with pet food would reasonably assume that the pet food has been vetted and approved by the FDA.  However, Plaintiffs did not elucidate the basis for the "reasonable assumption" that the pet food has been vetted and approved by the FDA.  Indeed the FDA's own Policy Guide expressly noted that "[f]or more than fifty years, dog and cat food manufacturers have marketed products identified on their labels or in labeling as being intended for use to diagnose, cure, mitigate, treat or prevent diseases" without FDA approval.

This statement seriously undercuts the reasonableness of Plaintiffs' asserted assumption, particularly where the assumption is not supported by any underlying factual assertions.  *See Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1199 (9th Cir. 2015) (clarifying that when a "chain of reasoning includes assumptions . . . [,] those assumptions cannot be pulled from thin air but need some reasonable ground underlying them").  In *Ibarra*, we concluded that neither the party advancing the assumption nor the party contesting the assumption proceeded from a position "grounded in real evidence."  *Id.*  This approach is consistent with the well-established pleading standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)

and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) requiring pleading of facts to state a plausible claim. *See Twombly*, 550 U.S. at 555 (mandating sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level") (citation omitted); *see also Iqbal*, 556 U.S. at 680 (clarifying that a complaint does not "suffice if it tenders naked assertions devoid of further factual enhancement") (citation, alteration and internal quotation marks omitted).

As described in greater detail below, the majority's reliance on "violations" of the Draft Policy Guide does not cure the defect in Plaintiffs' allegations because the Draft Policy Guide sets forth non-binding recommendations rather than actual regulations that could be violated. In addition, the Draft Policy Guide encourages veterinarian oversight in the selection and use of prescription pet food rather than discouraging such involvement. Finally, our precedent and precedent from one of our sister circuits foreclose the claim made by Plaintiffs based on use of the term "prescription."

It is informative to examine in some detail the provisions of each of the California statutes upon which the Plaintiffs' complaint is based. Such examination further exposes the deficiencies in Plaintiffs' pleading.

1. *California's Unfair Competition Law*

Interpreting California's Unfair Compensation Law (UCL), and applying California precedent, we have recognized a claim under the "unlawful prong" of the UCL predicated on violation of "virtually any state, federal, or local law." *Freidman v. AARP*, 855 F.3d 1047, 1052 (9th Cir. 2017). However, there must be an actual law involved. *See id.* As noted earlier, Plaintiffs did not rely on "any state, federal, or local law" in the allegations of their complaint. *Id.* (citation omitted). Rather, they referenced "violations"

of a non-binding Policy Guide.  Under our interpretation of the "unlawful prong" of the statute, *id.*, these allegations did not suffice to state a plausible claim for relief.  *See Iqbal*, 556 U.S. at 678 (explaining that the Rule 8 pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation") (citation omitted)[2, 3]

### 2.  *California's False Advertising Law*

To state a claim under California's False Advertising Law, the Plaintiffs must allege that they relied on a misrepresentation on a product label and, as a result of that reliance, they "paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so."  *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) (citations omitted).  Plaintiffs cannot state a plausible claim because they did not read the product labels prior to purchasing the products.  Rather, they admittedly relied on the advice of their respective veterinarians to purchase the prescription pet foods.

The majority opinion references "promotional materials with disease claims."  *Majority Opinion*, p. 7.  However, the majority does not, and cannot, point to any allegation that any of the Plaintiffs relied on these "promotional materials" to purchase prescription pet food.  The majority cannot make this assertion because the Plaintiffs made no such assertion.  Rather, the Plaintiffs consistently asserted that their

---

[2] Plaintiffs made no specific allegations of "unfair" or "fraudulent" business practices in their complaint.

[3] The advertising provisions of California's Unfair Competition Law overlap with the False Advertising Law.

purchases were prompted by referrals from their veterinarians.

Because the Plaintiffs failed to plead reliance on any product labels to induce their purchases of prescription pet food, the district court committed no error in dismissing their claim under California's False Advertising Law. *See Reid*, 780 F.3d at 958.

3. *California's Consumer Legal Remedies Act*

To state a claim under California's Consumer Legal Remedies Act, a plaintiff must allege that defendants engaged in one or more of the following unlawful practices, as potentially relevant to this case:

(1) Passing off goods or services as those of another.

(2) Misrepresenting the source, sponsorship, approval, or certification of goods or services.

(3) Misrepresenting the affiliation, connection, or association with, or certification by, another.

(4) Using deceptive representations or designations of geographic origin in connection with goods or services.

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.

(6) Representing that goods are original or new if they have deteriorated unreasonably or are altered, reconditioned, reclaimed, used, or secondhand.

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(8) Disparaging the goods, services, or business of another by false or misleading representation of fact.

(9) Advertising goods or services with intent not to sell them as advertised.

. . .

Cal. Civil. Code § 1770.

As discussed below, California's Consumer Legal Remedies Act is preempted in this context because the FDA has exclusive enforcement authority over the claims made by Plaintiffs predicated on alleged misrepresentations through use of the term "prescription pet food," and the healing properties of that food. Nevertheless, for purposes of our discussion, the only provisions of California's Consumer Legal Remedies Act that potentially apply based on the allegations of the complaint are:

(2) Misrepresenting the source, sponsorship, approval, or certification of goods or services.

(3) Misrepresenting the affiliation, connection, or association with, or certification by, another.

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

I am persuaded that these provisions of California's Consumer Legal Remedies Act are preempted by the federal Food, Drug and Cosmetic Act (FDCA). A similar issue was raised in *Perez v. Nidek Co., Ltd.*, 711 F.3d 1109 (9th Cir. 2013). In *Perez*, the plaintiffs underwent LASIK surgery for farsightedness with a laser system that had not yet been approved by the FDA for that use. *See id.* at 1112. Consequently, use of the laser system was considered an "off-label" use. *Id.* at 1111. Plaintiffs alleged that had they known the device was unapproved, they would not have undergone the surgeries. *See id.* at 1112.

Because the laser system was "a Class III medical device under the FDCA, as amended by the Medical Device Amendments of 1976," the laser system was subject to premarket approval before being utilized. *Id.* (citation omitted). Although the defendant who developed the laser system had received premarket approval to use the laser system to correct nearsightedness, the system had not yet been approved to correct farsightedness. *See id.* Plaintiffs alleged that the physician defendants impermissibly modified the approved laser system "to correct farsightedness before [the laser system] was approved for that purpose." *Id.* The plaintiffs also alleged that the laser

developer was aware of the illegal modifications and that the developer and physicians "conspired [with] and aided and abetted each other in their unlawful conduct." *Id.*

The FDA was aware of claims that the laser system was being used "off-label" and responded to the claims, including sending warning letters to the laser developer and to "certain physicians" who were using the laser system to correct farsightedness. *Id.* at 1113. The FDA specifically warned that because there was no premarket approval of the laser system for use to correct farsightedness, the laser system was "adulterated within the meaning of the Act."[4] *Id.* Plaintiffs alleged that despite the FDA's actions, the defendants continued to use to laser system to correct farsightedness. *See id.*

The plaintiffs asserted a "fraud by omission" claim against the defendants on the theory that defendants engaged in misleading behavior by failing to disclose that the laser system was not FDA-approved for LASIK procedures to correct farsightedness. The plaintiffs alleged that the defendants "knew or should have known" that the proposed class members believed the laser was FDA approved for such surgeries. *Id.* at 1117.

We held that the "fraud by omission" claim was "impliedly preempted because it conflict[ed] with the FDCA's enforcement scheme." *Id.* at 1119. We explained that it is the responsibility of the FDA to investigate potential violations of the FDCA. Because the Act provides the FDA "with a range of enforcement mechanisms," we concluded that "private enforcement of the statute is barred." *Id.*

---

[4] This was the same language used by the FDA in the Policy Guide upon which Plaintiffs rely in their complaint.

(citations omitted). We concluded that the plaintiffs' "fraud by omission claim exists solely by virtue of the FDCA requirements." *Id.* (citation, alterations, and internal quotation marks omitted). We clarified that the plaintiffs were barred from bringing any "claim that rests solely on the non-disclosure to patients of facts tied to the scope of [FDA] approval."[5] *Id.* We noted that the plaintiffs failed to cite even one case "where a court has allowed a plaintiff to bring suit solely for failure to disclose lack of FDA approval." *Id.* at 1120 (footnote reference omitted).

We discussed that the FDA was aware of the allegations that the laser system was being used for unapproved procedures. Although the FDA addressed the allegations with warning letters and an alert, the FDA "did not take final action against the defendants."[6] *Id.* In affirming dismissal of the plaintiffs' claim for "fraud by omission," we observed that the claim was preempted because matters of "adulterat[ion] . . . rest within the enforcement authority of the FDA, not this Court." *Id.*

As noted, the parallels between the facts in *Perez* and the facts of this case are inescapable. In both cases, the plaintiffs alleged that they were misled by the failure of Defendants to offer a product that had been approved by the FDA. In both cases, the FDA was made aware of the allegations that the defendants were providing "adulterated" products, that is products that were unapproved by the FDA. In both cases, the FDA addressed the allegations of adulteration—in *Perez*

---

[5] This claim is remarkably similar to Plaintiffs' claims predicated on use of the term "prescription."

[6] In our case, the FDA addressed the allegations against the Defendants in the Policy Guide, but also took no action against the Defendants in response to the allegations.

through warning letters and an alert and in this case through the issuance of the Draft Compliance Policy Guide. In both cases, no compliance action was taken against the defendants by the FDA. Under these circumstances, we concluded in *Perez* that the plaintiffs' claim of "fraud by omission" was preempted.

The same result is appropriate in this case. *See id.*; *see also Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993) (holding that the plaintiff's "claims that the defendants falsely represented that their drugs had been 'properly approved by the FDA' must fail") (punctuation omitted).

In *Mylan Labs*, the Fourth Circuit employed the same reasoning that we adopted in *Perez*. *See* 711 F.3d at 1120, n.6 (citing *Mylan Labs*). In *Mylan Labs*, the Fourth Circuit addressed a Lanham Act claim brought by Mylan Labs asserting claims for false advertising under the Lanham Act. *See* 7 F.3d at 1131–32. The Fourth Circuit first noted that the plaintiff in the complaint failed to "point[] to any statement or representation in the defendants' advertising which declared 'proper FDA approval.'" *Id.* at 1139. The Fourth Circuit then added that this deficiency could not be cured "by contentions that the very act of placing a drug on the market, with standard package inserts . . . somehow implies (falsely) that the drug had been properly approved by the FDA." *Id.* (internal quotation marks omitted). The Fourth Circuit reasoned that this theory, like the theory advanced by the plaintiffs in this case that use of the term "prescription" implied FDA approval, "is, quite simply, too great a stretch." *Id.*

In sum, our precedent and precedent from the Fourth Circuit foreclose a viable statutory claim predicated on implied FDA approval. Consequently, Plaintiffs' claim

predicated on the provisions of California's Consumer Legal Remedies Act was properly dismissed as preempted by the FDCA.  In addition, as with its other claims, Plaintiffs failed to adequately plead reliance.  *See Chapman v. Skype, Inc.*, 220 Cal. App. 4th 217, 230–32 (2013) (requiring allegation of actual reliance to sustain a claim under the Consumer Legal Remedies Act).

In conclusion, I am of the view that Plaintiffs failed to state a plausible claim for relief under California's Unfair Competition Law, False Advertising Law or Consumer Legal Remedies Act.

I would affirm the judgment of the district court.